UNITED STATES of America, Plaintiff-Appellee,

v.

**Richard NELL, Defendant-Appellant.**

**No. 74–4094.**

United States Court of Appeals, Fifth Circuit.

Feb. 13, 1976.

Rehearing Denied April 7, 1976.

P. D. Aiken, Ft. Lauderdale, Fla., for defendant-appellant.

Robert W. Rust, U. S. Atty., Miami, Fla., Lauren S. Kahn, Washington, D. C., for plaintiff-appellee.

Before GEWIN, GOLDBERG and DYER, Circuit Judges.

GOLDBERG, Circuit Judge:

Richard Nell, formerly president of the International Union of Operating Engineers (IUOE), Local 675, was convicted by a jury on five counts of embezzling union funds in violation of 29 U.S.C. § 501(c).[1] Launching a broad-ranged attack on these convictions, he complains of a pretrial denial of severance, refusals to sustain challenges for cause during the voir dire of prospective jurors, evidentiary rulings, certain instructions to the jury, and the sufficiency of the evidence. Since we agree that the district court abused its discretion in denying two of Nell's challenges for cause during the voir dire, we reverse and remand for a new trial.

During Nell's tenure as president of Local 675, a number of financial transactions took place that later became the subject of this criminal prosecution. The grand jury's indictment specified seven counts, all charging unlawful embezzlement and conversion of union funds; Nell was ultimately convicted on five counts.[2] Count I charged conversion of $6,000 for a European vacation for himself and others; Count II involved conversion of approximately $9,000 for personal legal fees; Count IV alleged that Nell had converted $3,650 for a 1970 Cadillac for his personal use; Count VI charged embezzlement of automobile and travel expense money; and Count VII charged similar embezzlement of $400 for false and fraudulent gasoline receipt claims.

The jury found Nell guilty on all five counts. He was sentenced to three years' incarceration on Counts I, II, and IV, to run concurrently. On counts VI and VII he received five year probated sentences, also concurrent with the first three counts. Because Nell has included a complaint about the sufficiency of the evidence in his appeal, we must first review the Government's case on each point to determine whether the court erred in not granting a directed verdict of acquittal on the five counts submitted to the jury. Following this, we consider the court's rulings during the jury selection, its ruling on the motion to sever Count II, and certain parts of the charge.

I. Sufficiency of the Evidence

*1. European vacation (Count I)*—During the summer of 1969, Nell, his wife, two other union officers, and their wives travelled to Europe. No one disputes

1. Section 501(c) of the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 401 *et seq.*, provides:

   Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use, or the use of another, any of the moneys, funds, securities, property, or other assets of a labor organization of which he is an officer, or by which he is employed, directly or indirectly, shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

2. At the close of the Government's case, the court granted judgment of acquittal as to Count III. At the close of all the evidence, it granted judgment of acquittal as to Count V.

the fact that the union underwrote this trip to the extent of $6,000. Rather, the issues were whether the trip had a union purpose and whether the $6,000 expenditure was properly authorized. At the trial, the authorization question was particularly troublesome. On the one hand, Nell introduced evidence tending to show that the local's Executive Board had authorized the union to reimburse Nell for his vacation, and that the general membership had approved the recommendation. Relying on article XXIII, subdivision 1, section (d) of the IUOE constitution,[3] which provides that the Executive Board's actions shall be maintained in full force subject to revocation by the membership, and on testimony and documents tending to show approval by the membership and disclosure of expenditures, he asserted that the evidence showed proper authorization. The Government, on the other hand, relied on article XXIII, subdivision 4, section (c) of the IUOE constitution, which requires specific approval by the membership and written approval by the International's General President to authorize expenditures of union funds for the personal benefit of individual members.[4] Nell does not dispute his failure to comply with XXIII(4)(c); he asserts that his ignorance of the particular provision showed lack of intent to defraud.

*2. Personal legal fees (Count II)* —Like the European vacation expenditures, the fact that monies were spent on Nell's personal legal fees was not dis-

puted. Instead, the controversy over this count centered first on whether the court should have granted Nell's motion to sever it and to try it before the court, and second, on whether the funds in question were "union money" subject to section 501(c). Nell wanted this count severed because the legal fees had been spent to overturn a 1932 Mann Act conviction and a 1970 Florida bribery conviction.[5] He argued that this information would prejudice him impermissibly in the jury's eyes. On the merits, he presented testimony tending to show that a voluntary defense fund had been created by the union members and that the disputed legal fees were paid out of this fund. He conceded that the special funds were deposited in the union's general account, but he asserted that the defense fund was earmarked on the books. The government disagreed, since no records pinpointing this alleged earmarking were introduced into evidence. Since nothing distinguished the defense fund from other union money, the Government argued that the ordinary authorization procedures applied. Again, the union minutes and records showed no request for or approval of the payments; thus the Government contends that the expenditures were illegal because unauthorized.

*3. Cadillac (Count IV)*—In 1968, the union presented a new Eldorado to Nell as a gift in recognition of his ten years' service. A year later, the car was sabo-

---

**3.** Article XXIII, subdiv. 1, sec. (d), provides in its entirety:

The Executive Board shall be the policy-making and administrative tribunal of the Local Union. It shall have such powers as may from time to time be delegated to it by action of the Local Union, or conferred by the Constitution. All acts of the Executive Board shall be reviewable by the Local Union but shall be maintained in full force and effect, subject to revocation by action of the membership of the Local Union if taken at the next subsequent membership meeting following the adoption of the act in question.

**4.** Article XXIII, subdiv. 4, sec. (c) provides in its entirety:

Any and all diversion of funds from a Local Union to or for the personal benefit of individual members by way of gifts, additional compensation for benefits or services otherwise paid for, retroactive compensation for services not previously authorized and similar situations shall be illegal and void unless prior to the payment thereof such payment is specifically approved by the membership and is approved in writing by the General President.

**5.** He was ultimately successful in both efforts.

taged. On August 7, 1969, the union minutes reflected the following entry:

> The Executive Board recommended that due to the misfortune that befell Brother Nell's engine, the local replace same with a new body and frame around it.

Nell alleged that the membership later approved the purchase of a replacement car;[6] however, the Government disputed this. Both sides agree that the car in issue was for Nell's personal use; again the question was one of proper authorization, since the records revealed no request for or receipt of written approval from the General President in accordance with article XXIII(4)(c). Instead, Nell relied on evidence that the purchases were disclosed in various reports and that the membership knew about them.

*4. Automobile and travel allowances (Count VI)*—From August 1969 to November 1973, Nell was paid $100 per month for automobile expenses and $65 per week for travel expenses. At the trial, the Government introduced a considerable volume of evidence showing that he received specific reimbursement for these expenses at the same time. His response was that the specific reimbursements covered only the expenditures that exceeded the allowances; he denied receiving double payments.

*5. False gasoline receipts (Count VII)*—Nell testified that his policy during the period in question was to submit gasoline receipts to the union for reimbursement when he had paid cash for his purchases. At times he submitted the tissue carbon of a particular invoice showing one amount and later submitted the cardboard copy of the same invoice for a

different amount. The Government contends that he embezzled union funds to the extent of the duplicate claims. The union, of course, never authorized double reimbursements, nor does Nell argue that it did. Rather, he denies the duplication.

*6. Sufficiency.*—In deciding whether the court below erred in submitting each of the five counts to the jury, we cannot weigh the evidence or judge credibility. "The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." *Glasser v. United States*, 1942, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680, 704. Applying that standard to the facts before us, we hold that the court's refusal to grant directed verdicts of acquittal on Counts I, II, IV, VI, and VII was correct. Thus, the most that Nell can hope for on this appeal is a new trial.

## II. Jury Selection

When the case came on for trial on October 15, 1974, the first order of business was jury selection. Pursuant to Rule 24(a), Federal Rules of Criminal Procedure, the court conducted the voir dire. Nell directs our attention to two jurors, Mr. Bougher and Mr. Schane, both of whom the court refused to excuse for cause.

Mr. Bougher, in response to a question from the court, revealed that he had been asked to join a union long ago and had declined. After Bougher's strongly anti-union response,[7] Nell's lawyer moved to strike him for cause. The court denied the motion. The next question the court asked was whether "any

---

**6.** Actually, Nell is charged with embezzling only $3,650 for the second car, the price after trading in the first. The union also bought another 1970 Cadillac for him, which was for union business. The Government does not dispute the validity of this purchase.

**7.** Mr. Bougher's complete answer is instructive as an early warning of his deep feelings against unions:

> MR. BOUGHER: Asked and declined. It goes back thirty-five years during the war.

> The plant I worked in was operated by a privately-owned individual and it was a grand place to work. Firestone came along and bought it out, the union came right behind them and I never saw morale disappear so quickly in all my life. The plant, so far as I'm concerned, just fell apart and I left. I just couldn't take it. And if you want— Well, that is the answer to that question.

juror [held] a personal belief, conviction or strong prejudice against the laws of the United States which regulate the conduct of labor unions or their officers?" Mr. Bougher volunteered an answer that speaks for itself:

MR. BOUGHER: I don't know whether this a direct answer to your question or not but just reiterates my prejudice against the thing. My brother and I have been equal partners in a service station in Ft. Lauderdale for twenty-five years. In recent years we have had to compete with this labor market which has robbed us of our help with their inflated wages. We are running a low-profit business to begin with and I am afraid this just affects me right down to the bone whenever a union comes into the picture because we lose our help to the construction industry which are paying these wages that we can't begin to meet; and whether that is your question or not, that is my answer.

THE COURT: Mr. Bougher, I want to advise each of you now that the question of trade unionism is not the issue—

MR. BOUGHER: Well, that is why I said—

THE COURT:—in this case.

MR. BOUGHER: I don't know whether I understood your question.

THE COURT: Any aspect of whether or not jurors might be in favor of the goals or objectives of trade unionism or any other aspect of labor unions or management is not at all what is involved here.

MR. BOUGHER: Well, I am sorry. The court admonished him that trade unionism was not the issue; somewhat unresponsively, he replied that he wanted to mention his position for the benefit of the court and the attorneys. Bougher's next answer revealed that his son was a union member. A little later, in response to a standard question to the panel about ability to render a fair and impartial verdict, Bougher again volunteered the statement that he could not judge how he would perform as a juror. Not once, even ritualistically, did Bougher aver that he could be fair and impartial.

Understandably, defense counsel moved again to excuse Bougher for cause. In a curious answer, the court said:

As to Mr. Bougher, he is in a rather unique position. He hates unions so much, evidently, that he might be the champion in the jury room for a defendant who is accused of taking money from a union. I mean, you could turn that one around and around. So I can't excuse him for cause.

It is clear from this statement that the judge realized that prejudicial fallout existed; the only remaining cloud of uncertainty was the question on which side the prejudice would fall. Nevertheless, the defense was forced to use one of its peremptory challenges to remove Mr. Bougher from the jury.

Mr. Schane, the other disputed prospective juror, presented a different problem. He had seen Nell before and knew who he was. Schane was an employee of Florida Power and Light Company and a member of the IBEW, a rival union of the IUOE. As Schane described it, the IBEW had had "a little problem at one time" with Local 675. Counsel for Nell immediately approached the bench and represented that the "little problem" was in fact a 500 man riot during a jurisdictional dispute between the two unions. Count III in Nell's indictment, which was still in the case at the time of voir dire, was directly related to the IBEW-Local 675 controversy. The defense moved to strike Schane for cause but the court denied the motion. Counsel then asked the court to inquire further into the venireman's knowledge of the dispute; again the court refused. Schane did say on several different occasions that he believed he could be impartial. However, the court never went beyond quite general questions regarding Schane's actual association with Nell.

Again the defense was compelled to use a peremptory challenge. Eventually Nell used all ten of his peremptory challenges, and he was forced to tender the jury.

The jury box is a holy place. To ensure that those who enter are purged of prejudice, both challenges for cause and the full complement of peremptory challenges are crucial. Therefore, as a general rule it is error for a court to force a party to exhaust his peremptory challenges on persons who should be excused for cause, for this has the effect of abridging the right to exercise peremptory challenges. *See Swain v. Alabama*, 1965, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759; *Stroud v. United States*, 1919, 251 U.S. 15, 40 S.Ct. 50, 64 L.Ed. 103, *petition for reh. denied*, 1920, 251 U.S. 380, 40 S.Ct. 176, 64 L.Ed. 317 (jury point discussed further). At stake is the party's right guaranteed by the Sixth Amendment to an impartial jury; the principal way this right is implemented is through the system of challenges exercised during the voir dire of prospective jurors. *See Swain v. Alabama, supra.* Although a trial court has broad discretion in its conduct of voir dire, *e. g., United States v. Fruge*, 5 Cir. 1974, 492 F.2d 1163, 1165, cert. denied, 419 U.S. 856, 95 S.Ct. 101, 42 L.Ed.2d 88–89; *United States v. Gassaway,* 5 Cir. 1972, 456 F.2d 624, 626, its exercise of that discretion is "subject to the essential demands of fairness." *Aldridge v. United States*, 1931, 283 U.S. 308, 310, 51 S.Ct. 470, 471, 75 L.Ed. 1054, 1056.

To judge whether these bounds have been respected, the relevant inquiry is "whether the procedure used for testing impartiality created a reasonable assurance that prejudice would be discovered if present." *United States v. Dellinger*, 7 Cir. 1972, 472 F.2d 340, 367, cert. denied, 1973, 410 U.S. 970, 93 S.Ct. 1443, 35 L.Ed.2d 706. *See United States v. Bailey,* 5 Cir. 1972, 468 F.2d 652, 658, *modified on different grounds*, 480 F.2d 518 (en banc); *United States v. Blount,* 6 Cir. 1973, 479 F.2d 650, 651. If "actual bias" is discovered, then the court must grant the challenge for cause. Actual bias can come to light during voir dire in two ways: by express admission or by proof of specific facts showing such a close connection to the circumstances at hand that bias must be presumed. *See United States v. Dellinger, supra,* 472 F.2d 340; *United States v. Boyd,* 5 Cir. 1971, 446 F.2d 1267, 1275; *United States v. Haynes*, 2 Cir. 1968, 398 F.2d 980, 984, cert. denied, 1969, 393 U.S. 1120, 89 S.Ct. 996, 22 L.Ed.2d 124.[8]

By definition, presumed bias depends heavily on the surrounding circumstances. Therefore, when a defendant is trying to prove presumed bias, the court has the duty to develop the facts fully enough so that it can make an informed judgment on the question of "actual" bias. *See United States v. Montelongo*, 5 Cir. 1975, 507 F.2d 639, 641. This duty cannot be discharged solely by broad, vague questions once some potential area of actual prejudice has

---

8. There is an unfortunate lack of clarity in the terminology relating to the different types of actual bias. Expressly admitted bias, of course, is the exception to this verbal disorder. However, what we have described as "presumed bias" is often called "implied bias." *E. g., United States v. Boyd,* 5 Cir. 1971, 446 F.2d 1267. The Supreme Court used the term "implied bias" to mean "bias as a matter of law" in *Dennis v. United States*, 1950, 339 U.S. 162, 70 S.Ct. 519, 94 L.Ed. 734. The Second Circuit apparently followed this usage in *United States v. Haynes,* 2 Cir. 1968, 398 F.2d 980, cert. denied, 1969, 393 U.S. 1120, 89 S.Ct. 996, 22 L.Ed.2d 124, where it included relationships such as kinship, master-servant, and interest in the same cause as kinds of implied bias.

The *Dellinger* court introduced some of the confusion by its comment that peremptory challenges were appropriate "where bias is suspected or implied." 472 F.2d at 367. This statement was unnecessarily restrictive, for it is clear that peremptory challenges can be exercised for any reason or for no reason at all. *Swain v. Alabama*, 1965, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759. We think that the term "implied bias" should be reserved for special relationships such as those enumerated in *Haynes*, while "presumed bias" should describe situations in which the circumstances point so sharply to bias in a particular juror that even his own denials must be discounted in ruling on a challenge for cause.

1230

emerged. *See Kuzniak v. Taylor Supply Co.,* 6 Cir. 1972, 471 F.2d 702; *United States v. Lewin,* 7 Cir. 1972, 467 F.2d 1132.[9] With these principles in mind, we turn to the district court's denials of challenges for cause with respect to jurors Bougher and Schane.

■ We read Mr. Bougher's statements during the voir dire as an express admission of bias. Never once did he say that he would be able to render a fair and impartial verdict. Rather, he reiterated how strongly he disliked unions. Because Mr. Bougher admitted to actual bias, it was error for the court to deny Nell a challenge for cause. Since the effect of the court's action was to reduce the number of peremptory challenges allowed the defense, we have no choice but to reverse. *United States v. Boyd, supra,* 446 F.2d at 1275 n.27.[10]

■ Schane's case is slightly more difficult, for he did say on several occasions that he believed he could be impartial. Still, in light of counsel's proffered information about the close connection between Schane's union and Nell's union and the magnitude of the riot, and the direct relationship of the riot to Count III of the indictment, we think the court erred in refusing to question Schane further about the particulars of these matters. We cannot say that Schane was actually prejudiced based on the information now before us, but further questioning might have elicited an admission or have revealed sufficient circumstances connecting Schane to Nell so that actual bias could be presumed. Because the court failed to explore Schane's potential bias adequately, it did not employ a procedure "creat[ing] a reasonable assur-

ance that prejudice would be discovered if present," *United States v. Dellinger, supra,* 472 F.2d at 367. Thus, even if Mr. Bougher's answers did not require reversal, we would be led to the same result because of the court's inadequate attention to Mr. Schane.

We have no psychic calibers with which to measure the purity of the prospective juror; rather, our mundane experience must guide us to the impartial jury promised by the Sixth Amendment. Doubts about the existence of actual bias should be resolved against permitting the juror to serve, unless the prospective panelist's protestation of a purge of preconception is positive, not pallid. Nevertheless, the need for the nod of negation is not always immediately obvious. For example, Bougher and Schane were not prejudicial twins, but they were siblings of the same concept. Bougher's articulated responses left no doubt as to his prejudice. Schane's answers, on the other hand, demonstrated the need for factual exploration before coming to a mature conclusion. Because these two jurors should have been excluded for cause, we reverse and remand this case for a new trial.

### III. Severance

■ Since our disposition contemplates retrial, we wish to discuss two more issues that inevitably will arise again: severance and jury instructions. The grand jury returned its indictment against Nell on July 24, 1974. On October 11, 1974, four days before the scheduled trial date, Nell moved to sever Count II under Rule 14 of the Federal Rules of Criminal Procedure.[11] Al-

---

9. This is not to say, of course, that the court must ask every question requested by counsel. It is enough if the court covers the substance of the necessary areas in its own questions. *E. g., United States v. Tramunti,* 2 Cir. 1975, 513 F.2d 1087, 1114.

10. Defense counsel told the trial court several times that its rulings were forcing him to use up his peremptories on jurors who should have been excused for cause. Since he actually did run out of peremptories, and since the court offered no more, the rulings could not have been harmless error. *See Stroud v. Unit-*

*ed States,* 1919, 251 U.S. 15, 40 S.Ct. 50, 64 L.Ed. 103, petition for reh. denied, 1920, 251 U.S. 380, 40 S.Ct. 176, 64 L.Ed. 317.

11. Rule 14 permits the court to "order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires" if either the defendant or the Government is prejudiced by joinder of offenses or defendants. However, the court has broad discretion in implementing this rule. *E. g., United States v. Miller,* 5 Cir. 1975, 513 F.2d 791.

though he conceded proper joinder under Rule 8(a), Federal Rules of Criminal Procedure, he asserted that the prejudice which would result from joinder warranted severance. He offered to waive jury trial with respect to Count II so that the additional time required for severance would be minimized. Even so, the court denied severance.

Nell does not dispute the fact that the grant or denial of a Rule 14 severance is within the discretion of the district court, and that denial will not warrant reversal unless clear prejudice is shown. *E. g. United States v. Miller*, 5 Cir. 1975, 513 F.2d 791, 793. We erected the following standard in *Tillman v. United States*, 5 Cir. 1969, 406 F.2d 930, *vacated in part*, 395 U.S. 830, 89 S.Ct. 2143, 23 L.Ed.2d 742 (electronic surveillance issues):

> The existence of prejudice, in large measure, depends upon the facts and circumstances of each case, . . . and it is axiomatic that the granting of a severance is within the discretion of the trial judge. . . . The burden of demonstrating prejudice is a difficult one, and the ruling of the trial judge will rarely be disturbed on review. . . . The defendant must show something more than the fact that "a separate trial might offer him a better chance of acquittal."

406 F.2d at 934–35 [citations omitted]. *Accord, United States v. Lane*, 5 Cir. 1972, 465 F.2d 408, 413–14.

Although the district judge's discretion is quite broad under *Tillman*, its responsibility to minimize potential prejudice during a trial is equally great. Nell argues on this appeal that the "other crimes" evidence brought in by Count II prejudiced him severely, and that Count II consumed nearly half the trial. However, the Government counters with the facts that the jury never learned that the 1932 conviction was for a Mann Act violation, that Nell himself brought out the state bribery conviction, that the jury was informed that both convictions were reversed on appeal, and that the judge gave a limiting instruction. These mitigating factors are illustrative of the steps that a careful trial judge can take to ensure that joinder under Rule 14 is not abused. Under the circumstances before us, we conclude that Nell failed to satisfy his heavy burden under the *Tillman* standard; thus the district court did not abuse its discretion in denying severance as to Count II.

IV. Jury Instructions

Nell's objection to the charge focuses on two particular parts. The first required the jury to decide whether the International constitution's authorization procedures were followed:

> If you find that the expenses were of the type that come within this (the International's) constitutional article, then you must determine whether the expenses were specifically approved by the General Membership of the local and approved in writing by the International General President. If not approved, then you may consider this as evidence of lack of proper authorization for personal expenses.

The second charged that

> If the Government proves that the expenditures of union funds was unauthorized or improperly authorized the Government need not also prove a lack of union benefit for the expenditures.

In other words, he contends that the instruction about authorization and the instruction relating lack of authorization to union benefit misstated the law.

*1. Authorization.*—Nell criticizes the first instruction to the jury as impermissibly making a controlling issue out of the failure to obtain the International General President's written permission for "local expenditures." We must disagree with this analysis for several reasons. First, as the Government points out, the court began by reading to the jury article XXIII(4)(c) of the International's constitution,[12] which applies to

12. See note 4, *supra*.

expenditures for the personal benefit of a member. Then it simply told the jury that if they found that the expenses at issue were "within this constitutional article"—*i. e.* if the expenses were for Nell's personal benefit—then they had to decide whether the approval procedures set out in article XXIII(4)(c) were followed. Thus, all "local expenditures" were clearly not at issue—only expenditures for an individual's personal benefit.

The instruction continued by saying that if the jury found that the expenditures were not approved, it could consider this as evidence of lack of proper authorization for personal expenses. Nell's argument seems to be that lack of proper authorization would not rise to the level of a violation of section 501(c). He reasons that a breach of a traditional fiduciary duty must occur before 501(c) is transgressed. Since the agreement between the local and the International is contractual, and since the International's constitution calls for approval by the General President, he concludes that a failure to obtain the General President's written approval would breach no fiduciary duty to the local members and thus would not violate section 501(c).

■■■■■ This argument misapprehends the nature of the crime created by 29 U.S.C. § 501(c). Section 501(c) fashioned a new federal crime whose scope extends beyond common law embezzlement. *See, e. g., United States v. Robinson,* 2 Cir. 1975, 512 F.2d 491; *United States v. Sullivan,* 1 Cir. 1974, 498 F.2d 146, *cert. denied,* 419 U.S. 993, 95 S.Ct. 303, 42 L.Ed.2d 265. Section 501(a) of the Labor-Management Reporting and Disclosure Act specifically states that officers of labor organizations occupy positions of trust in relation to the organization and its members. The purpose of section 501(c) was "to protect the general union membership from the corruption, however novel, of union officials

and employees." *United States v. Sullivan, supra,* 498 F.2d at 150. In this case, Local 675's By-Laws, issued over Nell's own signature, provided that the powers of the officers and the Executive Board were to be as prescribed by article XXIII of the International's constitution. The By-Laws further provided that anything in the By-Laws that conflicted with the International's constitution would be null and void. Thus, Nell did have a duty to the local members to abide by the International's constitution. The court's instruction that his failure to do so could be evidence of lack of proper authorization was not error.

■■■■ 2. *Union benefit.*—Finally, the court told the jury that if the Government proved lack of authorization, then it need not also prove lack of union benefit. Nell argues that this unnecessarily restricted the jury's consideration of criminal intent, citing the Second Circuit's opinion in *United States v. Ottley,* 2 Cir. 1975, 509 F.2d 667. *Ottley,* however, held only that if a union officer in good faith believed that a car purchased by the union was being used for union purposes *and* that the union had authorized the purchase, then 501(c) would not be violated. More directly on point is *United States v. Goad,* 8 Cir. 1974, 490 F.2d 1158, *cert. denied,* 417 U.S. 945, 94 S.Ct. 3068, 41 L.Ed.2d 665. Squarely presented with the question whether the Government had to prove lack of benefit to the union as an essential element of the 501(c) crime, the court held that fraudulent intent to deprive the union of its funds and a demonstrated lack of authorization were all that the Government had to establish. 490 F.2d at 1166. Thus, in the Eighth Circuit lack of union benefit is not part of the prosecution's case. We are persuaded by the extensive analysis of section 501(c) in *Goad* to agree with the Eighth Circuit that once lack of authorization is shown, the prosecution need not show lack of union benefit. The court's instruction here was

consistent with this view of the law; we therefore reject Nell's challenge to it.[13]

## V. Conclusion

Because of the trial court's erroneous refusal of one challenge for cause and its unwillingness to explore adequately for possible actual prejudice in a second instance, we order this case reversed and remanded for a new trial. We have spoken briefly on two points that are likely to recur on retrial for the trial court's guidance.[14] These points are subsidiary, however, to our concern about the danger inherent in an abridgement of the right to exercise peremptory challenges. Our system of jury trial depends upon the fair and impartial jurors guaranteed by the Sixth Amendment; because Nell received less than this, he must have another chance.

Reversed and remanded.

---

13. Because the central issue in Nell's case was intent to defraud, Nell would of course be free on retrial to assume the burden of introducing evidence of union benefit to show lack of intent. By the same token, the new jury would be free to consider lack of proper authorization as evidence of intent to defraud.

14. We have not reached Nell's points about the admissibility of evidence because these are most subject to the vagaries of a possible new trial. We wish, however, to note particularly that we have refrained from ruling on Nell's impassioned argument regarding the admissibility of his income tax returns. The court in the first trial was attempting to strike a balance between Nell's interest in admitting the return and the complex of interests in the pending IRS investigation. Since the status of that investigation may have changed by the time of the second trial, the court may need to reconsider its ruling.