IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 98-20821
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

RICHARD ALLISON HAMMOND,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Texas
(H-96-CR-172-1)
_____

December 8, 1999

Before KING, Chief Judge, and REYNALDO G. GARZA and EMILIO M.
GARZA, Circuit Judges.

PER CURIAM:[*]

Defendant-Appellant Richard Allison Hammond appeals his
conviction for one count of embezzling union funds in violation
of 29 U.S.C. § 501(c) and the district court's sentencing
determinations under seven counts of embezzling union funds in
violation of 29 U.S.C. § 501(c). We affirm his conviction, but
we vacate his sentence and remand for resentencing.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined
that this opinion should not be published and is not precedent
except under the limited circumstances set forth in 5TH CIR. R.
47.5.4.

1

Hammond was formerly the president and business manager of Local Union 988 (the "Local") of the International Brotherhood of Teamsters (the "Teamsters"). In 1994, the Teamsters heard complaints of possible misuse of union funds at the Local and began an audit of various accounts. The forensic accountant who performed the audit tendered his results, and a hearing was conducted pursuant to Article 19 of the Teamsters' constitution to determine whether certain officers, trustees and business agents of the Local had violated their duties. Hammond was found guilty of embezzling union funds. The Teamsters found that Hammond had charged personal expenses to the Local on his union American Express card and that he had misused funds from the Local's Health and Welfare account as well as its Democrat, Republican, Independent Voter Education ("DRIVE") account. Hammond's fellow executive board member, Lewis Stewart, and the Local's business agent, Gerald Doerr, were also found guilty of embezzling due to personal charges on their union credit cards. In addition, seven officers and trustees, including Stewart, were found to have breached their fiduciary duty to the Local membership by failing to examine Hammond's credit card charges in their monthly audits of the Local. A fifteen-count indictment against Hammond followed.

At trial, Hammond was convicted on fourteen of the fifteen counts: Count One, for embezzling employee welfare benefit plans in violation of 18 U.S.C. § 664; Counts Two through Ten, for

embezzling union funds in violation of 29 U.S.C. § 501(c) ("Section 501(c)"); Count Eleven, for making false statements to a bank in violation of 18 U.S.C. § 1014; and Counts Thirteen through Fifteen, for tax evasion in violation of 26 U.S.C. § 7201. In its presentence report ("PSR"), the probation office recommended that eleven points be added to Hammond's base level pursuant to U.S.S.G. § 2B1.1(b)(1)(L) because the amount of loss attributable to him was $407,752.49. Hammond filed objections, contesting, in relevant part, the loss calculations on seven counts of violating Section 501(c).

At Hammond's sentencing hearing, the district judge recalculated the total loss, in accordance with several objections not at issue here, to be $369,122.49. The recalculation did not affect Hammond's base level. In all other respects, the district judge overruled Hammond's objections and adopted the PSR. Hammond was sentenced to 51 months of imprisonment and five years of supervised release. He was also ordered to pay $369,000 in restitution and a $25,000 fine.

On appeal, Hammond raises issues only with respect to Counts Two through Nine, for embezzling union funds in violation of Section 501(c). He contests the district court's loss calculations under Counts Two through Eight, which involve his personal charges on the union American Express card. In addition, he challenges the sufficiency of evidence for his conviction for Count Nine, which involves his misuse of lobbying funds in the Local's DRIVE account.

3

A.  Sufficiency of evidence

Hammond contends that the evidence is insufficient to support his conviction for misusing the Local's DRIVE funds in violation of Section 501(c).  Viewing the evidence in the light most favorable to the verdict, we inquire whether a rational trier of fact could have found from the evidence and inferences therefrom that the defendant was guilty beyond a reasonable doubt.  See United States v. Lokey, 945 F.2d 825, 836 (5th Cir. 1991).

To establish a Section 501(c) violation,[1] the government must prove that Hammond lacked authorization to convert union funds to his own use and that his misuse of the money was "coupled with a fraudulent intent to deprive the union of its funds."  United States v. Durnin, 632 F.2d 1297, 1300 (5th Cir. 1980); see United States v. Dixon, 609 F.2d 827, 829 (5th Cir. 1980); United States v. Nell, 526 F.2d 1223, 1232 (5th Cir. 1976).  Fraudulent intent requires actual knowledge that the use was unauthorized.  See Dixon, 609 F.2d at 829; United States v. Rubin, 591 F.2d 278, 282 (5TH Cir.  1979).  Intent will generally be established circumstantially and may be established by proving

---

[1]Section 501(c) of the Labor-Management Reporting and Disclosure Act provides:

> Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use, or the use of another, any of the moneys, funds, securities, property, or other assets of a labor organization of which he is an officer, or by which he is employed, directly or indirectly, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

29 U.S.C. § 501(c).

the lack of benefit to the union from the use of the funds. See United States v. Belt, 574 F.2d 1234, 1238 n.17 (5th Cir. 1978). Once the government demonstrates that the use of funds was unauthorized, however, it need not prove a lack of benefit to the union as part of its case. See Nell, 526 F.2d at 1232.

We find that the record contains sufficient evidence of Hammond's lack of authorization and fraudulent intent to uphold his conviction. Hammond spent $19,300 to lease land on which to hunt deer, and he paid for these leases from DRIVE funds. DRIVE funds are generally spent on contributions to local political campaigns, membership education and grassroots political activity. DRIVE fund guidelines state that the money "cannot be used for general purposes or entertainment unrelated to communication to members." The fund is maintained at the Teamsters' national office and, upon request from a local union, the national office distributes the money. The local union's executive board then determines how the money will be spent. A former Local trustee testified that the executive board never approved Hammond's use of the money or even discussed the DRIVE fund at all. In addition, an official from the Teamsters' national office testified that the Teamsters' guidelines provide a narrow scope of acceptable uses for DRIVE funds and that the purchase of deer leases would not fall within these guidelines. Hammond argues that the guidelines are merely suggestions and that he did not break any law or union rule in purchasing the leases. A rational juror could nevertheless conclude that a

5

union president of twenty-five years would be aware of the strictures of the DRIVE fund guidelines and recognize that an expenditure for deer leases was unauthorized.

Furthermore, Hammond requested the funds from the national office by letter, stating that the money would be used for "area politics" and to "advance the membership, voter registration and voter information." He stated at trial that he had purchased the deer leases in order to entertain political figures. He conceded that he had never taken a political figure to the deer leases and had taken only five to seven other Local members there. The seller of the deer leases testified that Hammond had rarely used the leased land and that the only people he had seen Hammond bring there were his son and some of Hammond's friends. Although certain Local members may have benefitted from the deer leases by using them with Hammond, the lack of benefit to the Local as a whole coupled with the apparent deception regarding the stated uses to which the DRIVE funds would be put were sufficient to establish that Hammond fraudulently intended to deprive the Local of the use of its funds.

B. Sentencing

The district court, adopting the PSR's calculations, found that the total loss attributable to Hammond for misuse of his union American Express Card was $231,502.49: Hammond himself was responsible for charging personal expenses worth $189,790, while third-party charges attributable to Hammond totaled $41,712.49. Hammond contends that the district court improperly included

6

certain charges in calculating the total loss, which affected the determination of his offense level at sentencing. We review the district court's application and interpretation of the sentencing guidelines de novo and its factual findings for clear error. See United States v. Torres, 114 F.3d 520, 526 (5th Cir. 1997).

1. Loss Calculation

Hammond contends that the district court erred in attributing to him a $189,790 loss from his credit card expenditures. This court reviews a district court's loss determination for clear error. See United States v. Sutton, 77 F.3d 91, 95 (5th Cir. 1996). "For the purposes of subsection (b)(1) [of U.S.S.G. § 2B1.1], the loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information." United States Sentencing Commission, Guidelines Manual, § 2B1.1, comment. (n.3) (Nov. 1998).

The district court based its loss calculation on the results of the Teamsters' forensic audit ordered prior to the Article 19 hearing. The forensic accountant discovered $189,790 in questionable charges on Hammond's credit card which the district court concluded were "reasonable to count as related conduct...in the case of Mr. Hammond, since he was not only sworn but paid to keep track of these things for the benefit of the union members." Hammond argues that the district court should have lowered the $189,790 loss figure because (1) at the Article 19 hearing, the Teamsters found only $60,000 of loss due Hammond's misuse of his

7

credit card, (2) in its investigation, the FBI excluded certain categories of expenditures the district court's calculation includes, and (3) at trial, Hammond was convicted of embezzling $101,200, only $59,450 of which was related to American Express charges.

The district court properly noted that the government and the Teamsters attributed lower loss totals to Hammond because their investigations required a higher standard of proof.  That is, they were unable to definitively prove that Hammond's American Express charges were not legitimate Local expenses.  The Teamsters, for example, noted that Hammond had been charged with embezzling over $189,000, but they found him guilty of embezzling $60,000 for "plainly personal items."  For sentencing purposes, however, the government need only prove facts by a preponderance of the evidence.  See United States v. Hull, 160 F.3d 265, 269 (5th Cir. 1998); United States v. Jackson, 978 F.2d 903, 913 (5th Cir. 1992).

The Teamsters' forensic accountant testified at trial and detailed the method he used to investigate Hammond's American Express charges.  The accountant stated that, because Local officials were not required to turn in receipts specifying what their expenses were for, it was impossible to determine whether their charges were personal or business-related.  He therefore traced many of the charges through the records of specific vendors listed in the Local's itemized American Express bill.  He found monthly charges for thousands of dollars worth of guns,

8

clothing in particular sizes, luggage bearing Hammond' initials, and other "items which did not appear to relate to union business." Hammond testified that the bulk of these charges were business-related. The rest, he alleged, were mistakenly charged on the union's American Express, rather than on his own. Given the paucity of evidence supporting Hammond's claims, it is plausible in light of the record as a whole that the accountant's findings provided a reasonable estimate of the total loss attributable to Hammond from his American Express charges. Therefore, the district court's reliance on the forensic audit for its finding of loss was not clearly erroneous.

2. Third-party misconduct

Hammond also argues that the district court erred by attributing to him losses due to embezzlement by third parties and that the inclusion of these losses in his total loss increased his base offense level at sentencing by one level. We review the district court's application of the Sentencing Guidelines de novo. See United States v. Dean, 59 F.3d 1479, 1494 (5th Cir. 1995).

Under section 2B1.1(b) of the Sentencing Guidelines, the base offense level for embezzlement is calculated based on the dollar amount of the loss caused by the embezzlement. In calculating this base offense level, the sentencing judge holds the defendant accountable for losses due to the defendant's own conduct as well as for those due to the defendant's "relevant conduct." U.S.S.G. § 1B1.3. A defendant's relevant conduct

9

includes "all reasonably foreseeable acts and omissions of others in furtherance of jointly undertaken criminal activity." Id. § 1B1.3(a)(1)(B). Application Note Two to section 1B1.3 explains that "a defendant is accountable for the conduct...of others that was both: (1) in furtherance of the jointly undertaken criminal activity; and (2) reasonably foreseeable in connection with that criminal activity." Id. § 1B1.3, comment. (n.2). The Note explains further that, in applying this test, a "court must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake." Id. Thus, in order for Hammond to be accountable under section 1B1.3 for the losses incurred by third parties, the district court must have made findings establishing that: (1) Hammond agreed to undertake criminal activities jointly with third parties, (2) the losses caused by the third parties were within the scope of that agreement, and (3) the third parties' misconduct was reasonably foreseeable to Hammond. See United States v. Evbuomwan, 992 F.2d 70, 74 (5th Cir. 1993). These findings need not be expressly made, but the meaning of the court's findings must be clear. See United States v. Lghodaro, 967 F.2d 1028, 1030 (5th Cir. 1992).

The PSR attributed to Hammond the personal expenses of two employees that were charged to union American Express cards. The PSR stated starkly that "[t]he total loss from the American Express credit card account, including personal expenses by two employees, is $231,502.49." The PSR did not identify the employees, nor did it specify the exact amount of loss they

10

caused. The original PSR, however, had not included these third-party charges in its loss calculations. It was revised after consideration of the government's objection that Hammond should be held accountable for such losses. Relying on the Teamsters' findings in the Article 19 hearing, the government argued that the loss attributable to Hammond should include $41,712.49 in personal charges made by Louis Stewart, the Local's former board member, and Gerald Doerr, the Local's former business agent. The revised PSR reflected these charges but contained no finding that Hammond had agreed to a joint undertaking of criminal activity.

Hammond filed an objection to the revised PSR, arguing that his employees' charges should not be included in his loss calculations "[a]bsent proof of an agreement between Hammond and other Union members to defraud the Union." The district court overruled Hammond's objection and adopted the PSR's calculations, stating:

> One of the arguments is you shouldn't be charged for some of these expenditures by others because the argument goes you couldn't have reasonably known what they were doing. You were paid a huge salary to know what they were doing and to double check it. Unlike the nice man in the bank fraud conspiracy I pointed to, you were their leader, you ran things, you knew what they were doing and you knew why they were being allowed to get along. It is perfectly reasonable to charge you with the $41,000 defalcation of the others.

The district court's statement clarifies that Hammond should have reasonably foreseen the misconduct of Local employees. The statement does not, however, constitute a particularized finding that Hammond agreed to participate in an embezzling scheme with Stewart and Doerr. Nor does it explain how Stewart's and Doerr's

11

American Express charges furthered any joint undertaking of criminal activity with Hammond or were within the scope of any such agreement with him. We made it clear in United States v. Evbuomwan that such findings were "absolute prerequisites" to a sentence adjustment based on third-party misconduct. 992 F.2d at 74 (holding that foreseeability of third-party misconduct was irrelevant absent concurrent findings that defendant agreed to undertake criminal activity jointly with third parties and that third-party misconduct was within scope of that agreement).

The district court's reference to the "$41,000 defalcation of the others" appears to rely on the Teamsters' findings that Stewart and Doerr embezzled over $41,000 of Local funds. Although the court made references to the Teamsters' Article 19 decision during sentencing, it never stated that it was relying on any of the Teamsters' findings. Furthermore, the court never specifically identified Stewart and Doerr when discussing the $41,000 loss, much less an agreement to undertake criminal activity with Hammond. The district court's observation that Hammond was the "leader" who "ran things, [] knew what they were doing, and [] knew why they were being allowed to get along" suggests that there may have been an atmosphere of complicity among officials at the Local. While an atmosphere of complicity may be some evidence of jointly undertaken criminal activity, we ask for a specific finding of jointly undertaken activity because "the mere knowledge that criminal activity is taking place is not enough for sentence enhancement under § 1B1.3." Evbuomwan, 992

12

F.2d at 74.  Therefore, we must vacate the sentence and remand the case so that the district court can comply with the requirements of the Sentencing Guidelines when resentencing Hammond.

III.

For the foregoing reasons, we AFFIRM Hammond's conviction, VACATE his sentence and REMAND this case to the district court for resentencing consistent with this opinion.  On remand, the district court may reimpose the same sentence if it is able to rule explicitly that Hammond agreed to a joint undertaking of criminal activity with Louis Stewart and Gerald Doerr, and that Stewart's and Doerr's American Express charges were within the scope of that agreement.  Otherwise, the district court must determine the correct loss attributable to Hammond and impose a sentence consistent therewith.