UNPUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

WILLIAM DALE WHITE,

*Defendant-Appellant.*

No. 03-4249

Appeal from the United States District Court
for the Western District of North Carolina, at Statesville.
Lacy H. Thornburg, District Judge.
(CR-01-18)

Submitted: October 1, 2003

Decided: October 14, 2003

Before WILKINSON and NIEMEYER, Circuit Judges, and
HAMILTON, Senior Circuit Judge.

---

Affirmed in part, vacated in part, and remanded by unpublished per curiam opinion.

---

### COUNSEL

G. Bruce Park, NIXON, PARK & GRONQUIST, PLLC, Charlotte, North Carolina, for Appellant. Robert J. Conrad, Jr., United States Attorney, Jennifer Marie Hoefling, Assistant United States Attorney, Charlotte, North Carolina, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

## OPINION

PER CURIAM:

William Dale White appeals his thirty-month sentence imposed after pleading guilty to one count of conspiracy to transport stolen goods in interstate commerce, in violation of 18 U.S.C. §§ 371, 2314 (2000). Because we find that the district court did not make adequate factual findings as to one aspect of its sentencing determination, we affirm in part, vacate in part, and remand for resentencing.

The charges against White arose from an FBI investigation into a burglary ring that committed various thefts of commercial supplies and equipment from asphalt plants, aggregate plants and other construction sites in several southeastern states. During the course of the federal investigation, White gave a signed and dated statement to FBI agent George Glorioso in which he admitted his illegal activities. In this statement, White noted that he purchased stolen equipment on fifteen to twenty occasions over the course of six to eight years from Jamie Coleman. He further stated that he became aware that the goods he bought were stolen on about his second or third purchase from Coleman. White stated he purchased items such as generators, construction tools, grinders and hand tools at well below fair market value. In the FBI statement, White also admitted that he purchased stolen property from his brother, Tommy White, on another fifteen to twenty occasions. Tommy White had purchased the items originally from Coleman. White further stated that on one occasion, he bought stolen items from Richard Averson that were originally stolen by Coleman. This purchase included two saws and a large socket set.

The presentence investigation report ("PSR") devoted one numbered paragraph (¶ 21) and an additional sentence (in ¶ 13) to White's specific criminal activities. Paragraph 21 is based on the signed FBI statement described above. This paragraph, which is critical to the issues White raises on appeal, reads in full:

On March 22, 2001, William Dale White gave authorities [agent Glorioso] a signed statement concerning his involvement in interstate transportation of stolen property. William White admitted purchasing stolen property (various tools and equipment) from Frankie Coleman for the past ten years.[1] William White also advised he had directly purchased stolen property from Frankie Coleman on about 15 to 20 occasions. William White also advised he had purchased stolen property indirectly, through his brother Tommy Mitchell White, from Frankie Coleman on another 15 to 20 occasions. White gave investigators several receipts that documented the transactions conducted with Frankie Coleman.[2] Evidence indicates the loss amount attributable to William White is at least $1,000,000.

(JA 137).

The relevant sentence in ¶ 13 of the PSR states that "authorities determined" that White was the "fence primarily responsible" for the smaller equipment stolen by Coleman, such as generators, grinders, and tools. The PSR states that co-conspirators Richard Averson and Louie Averson were the fence "primarily responsible" for the larger types of equipment stolen by Coleman, such as electromagnetic starters, reducers and breakers.

In formulating White's sentence under the 2000 edition of the *U. S. Sentencing Guidelines Manual*,[3] the probation officer increased White's offense level by thirteen levels pursuant to § 2B1.1(b)(1)(N) because the probation officer concluded the monetary loss amount

---

[1]The ten years figure is apparently an error on the part of the probation officer. White's FBI statement indicates that the amount of time in question is actually six to eight years.

[2]The "receipts" to which the PSR refers are mentioned in somewhat more detail in the actual statement White gave to the FBI. In the statement, White declares that: "on several occasions, I completed receipts for the purchases from Coleman or bill of sale. I have furnished the interviewing agent [Glorioso] with the bill of sales for four purchases."

[3]White does not contest that this is the proper edition of the guidelines manual for his sentencing.

attributable to White was between $800,000 and $1,500,000, apparently representing the entire loss amount caused by the conspiracy as a whole. The PSR further indicated that White deserved a four-level enhancement under § 2B1.1(b)(4)(B) for being "in the business" ("ITB") of receiving and selling stolen property.

White filed written objections to the PSR's determination of both the attributable loss amount and the ITB enhancement. White also specifically objected to the PSR's sentence in ¶ 13, which stated White was the "fence primarily responsible" for Coleman's smaller stolen items, such as welders, generators and hand tools. With regard to the amount of loss, White argued that he "could not reasonably foresee the totality of Frankie Coleman's thefts" and that, while he purchased small items, "he was not involved in the more sophisticated items that were stolen." (JA 158). Therefore, he asserted the PSR improperly attributed the conspiracy's total loss of between $800,000 and $1,500,000 to him. Despite the objections, no changes were made to the PSR on these points.

At the sentencing hearing, White noted and argued the same objections he made to the PSR and testified in support of these objections. His testimony contradicted, or was at least inconsistent with, some of the information in his statement to agent Glorioso. Specifically, he stated at the hearing that he only purchased items from Coleman on "five" occasions (not "fifteen to twenty occasions") and that the purchases consisted of "four or five" truckloads of items. (JA 96-97). However, he testified that he did not "make it a business practice" to purchase Coleman's stolen items. (JA 97). White estimated that each time he paid "between $800 to 17-$1,800" for merchandise that was actually worth "$1,500 [or] $2,500." (JA 98, 107). In total, White testified that the items he bought from Coleman were worth "around five, six thousand dollars." (JA 108). The district court summarily overruled White's objections and adopted the PSR without making any separate factual findings.

The standard of review for sentencing decisions operates on a flexible sliding scale. *United States v. Daughtrey*, 874 F.2d 213, 217 (4th Cir. 1989). In general, this Court reviews a district court's factual findings for clear error and its application of the guidelines de novo. *Id.*

White argues that the district court clearly erred by relying entirely on the PSR without making any specific findings of fact on the amount of loss attributable to him. White asserts that under *U. S. Sentencing Guidelines Manual* § 1B1.3(a)(1)(B) (2000) and its interpretive case law, the district court should have made specific factual findings on the scope of White's agreement with the other conspirators and the reasonable foreseeability of their conduct to him. In the absence of such factual findings, White asserts, the district court could not attribute the entire loss amount of the conspiracy to him. Because the district court "declined to assess [his] role in the overall conspiracy," White argues that the sentence must be vacated and the case remanded for specific factual findings on the amount of loss. We agree.

The "relevant conduct" provisions of USSG § 1B1.3 state that the base offense and specific offense characteristics shall be determined on the basis of "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken activity." As the relevant conduct determines the offense level for finding the sentencing range, so too does the loss caused by the relevant conduct. USSG § 1B1.3(a)(3); *see also* USSG § 2B1.1(b).

As the Application Notes to § 1B1.3 point out, "[t]he principles and limits of sentencing accountability under this guideline are not always the same as the principles and limits of criminal liability." USSG § 1B1.3, comment. (n.1). And although relevant conduct for purposes of determining the offense level may be broader than the conduct supporting the offense of conviction, it may also be narrower. Thus, the Application Notes provide:

> Because a count may be worded broadly and include the conduct of many participants over a period of time, the scope of the criminal activity jointly undertaken by the defendant (the "jointly undertaken criminal activity") is not necessarily the same as the scope of the entire conspiracy, and hence relevant conduct is not necessarily the same for every participant.

USSG § 1B1.3, comment. (n.2).

Focusing particularly on the offense of conspiracy, the Application Notes point out that the defendant's relevant conduct may not extend to all the conduct of the conspiracy:

> A defendant's relevant conduct does not include the conduct of members of a conspiracy prior to the defendant joining the conspiracy, even if the defendant knows of that conduct (e.g., in the case of a defendant who joins an ongoing drug distribution conspiracy knowing that it had been selling two kilograms of cocaine per week, the cocaine sold prior to the defendant joining the conspiracy is not included as relevant conduct in determining the defendant's offense level).

*Id.*; *accord United States v. Bolden*, 325 F.3d 471, 499 (4th Cir. 2003) (vacating sentence because neither PSR nor district court made "'*particularized* findings with respect to both the scope of the defendant's agreement *and* the foreseeability of his co-conspirators' conduct before holding defendant accountable for the scope of the entire conspiracy'") (quoting *United States v. Campbell*, 279 F.3d 392, 400 (6th Cir. 2002) (emphasis in original)); *United States v. Hammond*, 201 F.3d 346, 351 (5th Cir. 1999) (vacating sentence which attributed to defendant losses incurred by third parties because PSR, upon which district court relied, did not contain the "absolute prerequisite" factual findings as to the scope of joint undertaking or foreseeability of losses); *see also United States v. Gilliam*, 987 F.2d 1009, 1012-13 (4th Cir. 1993) ("in order to attribute to a defendant for sentencing purposes the acts of others in jointly-undertaken criminal activity, those acts must have been within the scope of the defendant's agreement and must have been reasonably foreseeable to the defendant").

We have reviewed the PSR adopted by the district court and conclude it contains insufficient information on White's relevant conduct under § 1B1.3. The PSR does not, as required by § 1B1.3, make any particularized factual findings on both "the scope of the defendant's agreement" and "the foreseeability of his co-conspirators' conduct before holding the defendant accountable for the scope of the entire conspiracy." *Bolden*, 325 F.3d at 499 (citations omitted). The failure to make these particularized findings makes the sentencing court's loss determination "inadequate," requiring remand. *Id.* at 500, 505. As White points out in his brief, the district court and the probation offi-

cer apparently concluded that because White was convicted for conspiracy, he may be automatically charged with the entire amount of loss caused by the conspiracy. However, as the commentary to § 1B1.3 and *Bolden* make clear, the amount of loss cannot be decided in this summary fashion.

The commentary to the 2002 *Guidelines Manual* clarifies the standard for determining whether a defendant warrants an ITB enhancement. Specifically, the Sentencing Commission adopted a "totality of circumstances" test. The district court, in applying this test, is directed to the following factors: (1) the regularity and sophistication of the defendant's activities; (2) the value and size of the inventory of the stolen property; (3) the extent to which the defendant's activities encouraged or facilitated other crimes; and (4) the defendant's past activities in stolen property. *United States Sentencing Guidelines Manual* § 2B1.1, comment. (n.4) (2002).

We conclude that White's PSR, and the FBI statement upon which it is based, contain sufficient factual findings to sustain the ITB enhancement. White was involved in purchasing stolen property numerous times over a course of six to eight years. White bought items from several different people charged in the conspiracy. White purposely bought the items well below fair market value so that he could resell them for a profit. In our view, the determination that White was "in the business" of receiving and selling stolen property is not clearly erroneous. We therefore affirm that aspect of the district court's sentencing determination.

For all of the foregoing reasons, we affirm in part, vacate in part and remand for resentencing consistent with this opinion. We express no view on the amount of loss actually attributable to White relative to his individual role. We affirm the district court's determination as to the four-level ITB enhancement. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not aid the decisional process.

*AFFIRMED IN PART, VACATED*
*IN PART AND REMANDED*