**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

September 9, 2009

Charles R. Fulbruge III
Clerk

No. 08-10655

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

JUSTIN LIVINGSTON

Defendant-Appellant

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 08-10655

Before BENAVIDES, DENNIS, and ELROD, Circuit Judges.

PER CURIAM:[*]

Appellant Justin Livingston pleaded guilty to possessing counterfeit U.S. obligations and conspiring to manufacture U.S. counterfeit obligations in violation of 18 U.S.C. §§ 472, 371, and 471 (1994). The district court sentenced him to 60 months of imprisonment and two years of supervised release. The district court also ordered him to pay $95,680.43 in restitution. Livingston's sole claim on appeal is that the district court clearly erred when it determined the

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

amount of counterfeit currency attributable to him. Concluding that the district court erred, we VACATE and REMAND for resentencing.

## I.    FACTUAL AND PROCEDURAL HISTORY

In May 2007, Glendon Reid and Omar Morrison came from Washington, D.C., to Dallas to meet with Terri Grant. Reid and Morrison brought with them a compact disc that contained images to be used to make counterfeit currency. The trio bought a printer to manufacture the counterfeit currency. Subsequently, Grant solicited Appellant Livingston to buy another printer. Grant and Livingston copied the images of the currency onto compact discs and Livingston's computer. Grant taught Livingston, who is a graphic artist, how to manufacture $100 bills. Grant provided Livingston with authentic $5 bills and showed him how to bleach and reprint the bills using the counterfeit $100 bill images. Livingston later recruited codefendant Bryan Longoria to participate in the counterfeiting scheme. Livingston also provided computers to manufacture the currency. Livingston showed codefendants Longoria, April Friel, and Robert Walker how to manufacture the currency.

Reid and Anthony Landry made counterfeit currency in addition to that manufactured by Livingston and his co-conspirators. Grant's cousin, Temeka Jefferson, also manufactured counterfeit currency. Grant admitted that she sold compact discs containing the counterfeit images to Dydra Mohammed and Tracey Willis. Jefferson admitted to manufacturing approximately $7,000 in counterfeit $100 bills with Grant. Jefferson told the agents that Grant had stated that Morrison and Reid had manufactured as much as $100,000 when they were at Grant's home.

On October 2, 2007, the police searched a hotel room occupied by Livingston and his co-conspirators and discovered Livingston in possession of counterfeit currency. Subsequently, on February 5, 2008, a federal grand jury issued a superseding indictment charging Livingston, Longoria, Walker, Friel,

and Grant with one count of possessing counterfeit obligations in violation of 18 U.S.C. § 472 and one count of conspiracy to manufacture counterfeit obligations of the United States in violation of 18 U.S.C. §§ 371 and 471. Livingston pleaded guilty to the charges without a plea agreement.

At Livingston's sentencing hearing, the district court adopted the PSR and the Addendum to the PSR, as supplemented at sentencing, and determined Livingston's guidelines calculation as follows.[1] Pursuant to U.S.S.G. § 2B5.1, Livingston's base offense level was 9. This offense level was increased by 12 levels under § 2B5.1 and § 2B1.1 because the value of the counterfeit currency attributable to Livingston was $232,300, which falls between $200,000 and $400,000. The district court also applied other adjustments to his offense level pursuant to the guidelines that are not at issue on appeal. With a criminal history category of II and a total offense level of 24, Livingston's revised advisory sentencing guidelines range was 57 to 71 months of imprisonment. The district court sentenced Livingston to 60 months of imprisonment and two years of supervised release. He was also ordered to pay $95,680.43 in restitution. Livingston now appeals his sentence.

II.     AMOUNT OF LOSS

Livingston contends that the court clearly erred in attributing the entire amount of counterfeit obligations recovered in the Dallas-Fort Worth area that was linked to the same images Livingston used to make the counterfeit obligations. Livingston asserts that neither his conduct nor his relevant conduct should result in the entire $232,300 amount of counterfeit funds passed in the Dallas-Fort Worth area from June 2007 to June 2008 being attributable to him. Livingston contends that the evidence demonstrates that some portion of the

---

[1] The PSR initially held Livingston accountable for the loss incurred from the manufacture of fraudulent credit cards. Ultimately, the district court did not include that loss, and it is not before us on this appeal.

$232,300 amount was passed by sources not related to Livingston and his co-conspirators.

A district court's calculation of amount of loss is a factual finding that we review for clear error. *United States v. Reasor*, 541 F.3d 366, 369 (5th Cir. 2008). "[I]n order to satisfy this clear error test all that is necessary is that the finding be plausible in light of the record as a whole." *Id.* (internal quotations marks and citations omitted). "'The presentence report is considered reliable evidence for sentencing purposes.'" *Id.* (quoting *United States v. Clark*, 139 F.3d 485, 490 (5th Cir. 1998)). If a defendant fails to submit evidence rebutting the PSR, the sentencing court is free to adopt its findings without additional inquiry or explanation. *Id.*

U.S.S.G. Section 1B1.3 provides that a defendant is accountable for losses that are due to the defendant's "relevant conduct." *United States v. Hammond*, 201 F.3d 346, 351 (5th Cir. 1999). "A defendant's relevant conduct includes 'all reasonably foreseeable acts and omissions of others in furtherance of jointly undertaken criminal activity.'" *Id.* (quoting § 1B1.3(a)(1)(B)). The commentary to the relevant conduct guideline provides that "'a defendant is accountable for the conduct . . . of others that was both: (1) in furtherance of the jointly undertaken criminal activity; and (2) reasonably foreseeable in connection with that criminal activity.'" *Id.* (quoting § 1B1.3, comment. (n.2)). Additionally, the commentary explains that an individual defendant's scope of criminal activity "is not necessarily the same as the scope of the entire conspiracy, and hence relevant conduct is not necessarily the same for every participant." § 1B1.3, comment. (n.2). Thus, a sentencing "court must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake." *Id.*; *Hammond,* 201 F.3d at 351. Although the above-listed "findings need not be expressly made, . . . the meaning of the court's findings must be clear." *Hammond,* 201 F.3d at 351.

4

In an analogous case, the district court found that the defendant, Hammond, was accountable for the total loss caused by an embezzling scheme. *Id*. at 352. Hammond objected, contending that he should not be held accountable for the losses caused by two other employees unless there was proof that Hammond and the others agreed to defraud. *Id*. at 351. The district court overruled the objection, finding that Hammond should have reasonably foreseen the conduct of the other employees but the court did not make a finding that Hammond agreed to engage in a scheme to defraud. *Id*. at 352. On appeal, this Court vacated the sentence, holding that the court erred by failing to make a finding that the appellant agreed with the other employees to participate in a scheme to defraud.

Likewise, in the instant case, the district court held Livingston accountable for the entire $232,300 losses reported by the banks in the Dallas-Fort Worth area. In his written objections to the PSR and also verbally at the sentencing hearing, Livingston objected to the court's use of the entire amount of the loss because the evidence showed there were persons other than his co-conspirators manufacturing these counterfeit bills. The court overruled Livingston's objections and stated as follows:

> Okay. I will make the same findings that I made earlier and that is the – the presentence report and the addendum, as well as the evidence presented here today, provide sufficient indicia of reliability to support the conclusions reached by the probation officer with respect to the loss amount that is attributable to Mr. Livingston.
>
> Specifically, the probation – in addition to what I said earlier, the probation officer in the presentence report indicates that she will take a conservative view on calculating loss amount.
>
> The guidelines require the Court to come – to reasonably estimate the loss amount, and in part because of the difficulty in arriving at the loss amount, and I think that is evidenced by this

5

case, the facts in this case show that the defendants, including Mr. Livingston, were creating these hundred-dollar bills, and they created a substantial number of 100-dollar bills, such that it's impossible to know, with certainty, how many they created.

But the agent in this case has testified and has used what I believe to be a reasonable method. He and the probation officer have used a reasonable method to arrive at the number that they have arrived at, and so for those reasons, I will overrule your objection.

At the sentencing hearing, Special Agent Jeff McMickle testified that banks in the Dallas-Fort Worth area discovered the counterfeit bills and reported the currency to the government. After receiving the counterfeit currency from the banks, the agents would enter the information in a "database that [they] keep based on actual money received." McMickle further testified that the $232,300 figure constituted the total amount of counterfeit currency marked with the serial numbers linked to members of the conspiracy that were passed in the Dallas-Fort Worth area. However, on cross examination, defense counsel asked McMickle whether "it is true that there are other individuals, beyond the five members of the conspiracy being sentenced today, who also have copies of the images that were – that have these serial numbers on Exhibit 1?" McMickle responded: "Right. We believe there are other people that were provided the images through the people that came down from the DC area, and then specifically in Dallas-Fort Worth through Ms. Grant and Mr. Livingston." McMickle further testified that:

> [W]e know that there are other people involved in Dallas-Fort Worth obviously because it's still going on, however, we believe those were channeled through the two individuals that came down from DC [Reid and Morrison], where the notes originated, who were good friends with Ms. Grant, who then basically set up the operation here in Dallas and was involved in distributing those images."

6

In addition to Livingston and his co-conspirators, McMickle testified that the following people possessed the images while in the Dallas-Fort Worth area: Glendon Reid; Omar Morrison; Anthony Landry; and Temeka Jefferson. McMickle further testified that there were other individuals who were involved in manufacturing the counterfeit currency but they were not identified. Also, subsequent to Livingston's arrest, banks in the Dallas-Fort Worth area continued to report instances of counterfeit currency with the same serial numbers.

As previously set forth, Livingston contends the district court erred in holding him accountable for the entire amount of the counterfeit currency. The government asserts that § 1B1.3(a)(1)(B) does not apply because Livingston was a direct cause of the $232,300 introduced into the Dallas-Fort Worth area. The PSR and the sentencing hearing belie this assertion. The government likens Livingston's role to a wholesale distributor in the commentary to § 1B1.3. To the contrary, the evidence shows that Reid and Morrison, at the request of Grant, introduced the counterfeit images to the Dallas-Fort Worth area. Indeed, Grant taught Livingston how to manufacture the counterfeit bills. The undisputed evidence further demonstrates that Grant sold the counterfeit images to individuals apparently not associated with Livingston. Thus, we reject the assertion that § 1B1.3(a)(1)(B) does not apply.

Here, the district court did not find, and the PSR does not demonstrate, that Livingston agreed to manufacture counterfeit currency with individuals other than his charged co-conspirators.[2] The district court also failed to

---

[2] We note that there is some evidence that Livingston was aware that Grant was involved with others who manufactured counterfeit currency. Nonetheless, "[w]hile an atmosphere of complicity may be some evidence of jointly undertaken criminal activity, we ask for a specific finding of jointly undertaken activity because the mere knowledge that criminal activity is taking place is not enough for sentence enhancement under § 1B1.3." *Hammond*, 201 F.3d at 352 (internal quotation marks and citation omitted).

determine the scope of the criminal activity that Livingston agreed to jointly undertake with individuals other than his co-conspirators. We have held that such findings are "absolute prerequisites" to holding a defendant accountable for a third person's misconduct. *Hammond*, 201 F.3d at 352. "Although the district court on remand is not bound by the guidelines, it must consider them, and in doing so, it is required to calculate the proper guidelines range." *United States v. Sanchez*, 527 F.3d 463, 466 (5th Cir. 2008). We therefore VACATE Livingston's sentence and REMAND the case for resentencing.

VACATED and REMANDED.