United States Court of Appeals
Fifth Circuit

**F I L E D**

**August 17, 2005**

Charles R. Fulbruge III
Clerk

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

———————————————

No. 03-41590

———————————————

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

JOSE LUIS BETANCOURT,

Defendant - Appellant.

———————————————————————————————————

Appeal from the United States District Court
For the Southern District of Texas

———————————————————————————————————

Before GARWOOD, SMITH, and CLEMENT, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge.

Jose Luis Betancourt was convicted of drug trafficking and forced to forfeit his interest in Texas lottery winnings of over $5 million because the ticket was purchased with proceeds of that trafficking. He appeals his sentence of 292 months and the forfeiture. Having carefully reviewed the record and the parties' submissions, we find no error in the sentencing or forfeiture and affirm the judgment of the district court.

# I. FACTS AND PROCEEDINGS

A.  Proceedings Below

On February 12, 2003, Betancourt was indicted for possession with intent to distribute more than five hundred grams of cocaine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B) and 18 U.S.C. § 2.  Fourteen days later, the grand jury returned a superseding indictment charging Betancourt with conspiracy to possess more than five kilograms of cocaine between September 2002 and January 2003, thirty-six grams of cocaine on January 16, 2003, and 1.63 kilograms on January 17, 2003. The superseding indictment also included a notice of the criminal forfeiture of $5,481,462.91 in Texas lottery proceeds, pursuant to 21 U.S.C. § 853, on the theory that the money was property derived from violations of 21 U.S.C. §§ 841 and 846.

At the conclusion of the trial, Betancourt was found guilty on all three counts of the superseding indictment.  The jury then answered special interrogatories for the separate forfeiture phase and found that Betancourt purchased a winning Texas lottery ticket on December 11, 2002, "with proceeds the defendant obtained, directly or indirectly, during the course of the conspiracy of which [the jury had already] found him guilty, and there was no likely source for such property other than the conspiracy."

On June 25, 2003, the district court entered a preliminary order of forfeiture in the amount of $5,481,462.91, all of which was attributed to Betancourt's winning Texas lottery ticket  On November 4, 2003, the district court sentenced Betancourt to a term of 292  months of imprisonment to be followed by five years of supervised release.[1]

---

[1] The district court sentenced Betancourt to 292 months of imprisonment as to counts one and three, to be served concurrently, and 240 months as to count two, to be served concurrently with the sentence for counts one and three, for a total term of 292 months of imprisonment.  This

B. Facts

(1) Cocaine Trafficking

Betancourt was convicted of possession with intent to distribute cocaine and conspiracy to possess cocaine. The government presented evidence to prove that Betancourt was not only involved in drug dealing, but was also the leader of an extensive cocaine distribution chain. Jose Denicio Esparza, the government's principal witness, first met Betancourt in 2000 and began buying cocaine from him. By mid-2002, the amount of cocaine Betancourt sold to Esparza gradually increased to approximately two ounces per day, every day except Sunday when Betancourt did not sell drugs. Esparza not only worked directly with Betancourt, but also sold cocaine purchased from Betancourt to many others. After winning the lottery, Betancourt taught Esparza how to run his cocaine business, and trained him to manage his "cut and dilute" scheme. The two agreed that Betancourt would front Esparza the cocaine, and Esparza in turn would handle the day-to-day operations.

Betancourt was also acquainted with Ramon Negrete who testified that Esparza's residence served as a central meeting place for numerous drug dealers buying cocaine from Betancourt. Negrete observed countless drug deals, and he was continually in contact with United States Bureau of Immigration and Customs Enforcement ("Customs") agents in his capacity as a confidential informant, providing them with information regarding Betancourt's cocaine trafficking.

Betancourt eventually relocated his base of operations from Esparza's home to Negrete's home, which provided Negrete with the ability to observe Betancourt's drug deals first-hand. Negrete

term is to be followed by five years of supervised release as to counts one and three, to be served concurrently, and three years supervised release as to count two, to be served concurrently with the terms for counts one and three, for a total term of supervised release of five years. The court imposed the mandatory special assessment of $300 and did not impose a fine.

testified that Betancourt sold packages of cocaine varying from a quarter ounce to three ounces in weight, six days a week, and that Betancourt always placed his drug proceeds in a small black bag that he carried on his person at all times. Negrete's observations provided evidence that Betancourt was not guilty of simple cocaine possession on a few occasions, but rather that he was a primary supplier for numerous other dealers.

By November 2002, Betancourt was prepared to expand his drug dealing enterprise and instructed Negrete to first build him a "clavito" or little compartment with sufficient space to hold two to three kilograms of cocaine. Betancourt told Negrete that he was a ten kilogram a week dealer, and he asked Negrete to remodel his warehouse to store 100 kilograms of cocaine for Betancourt.

On January 16, 2003, U.S. Customs agents secretly recorded a conversation between Negrete and Betancourt with Negrete's cooperation. Betancourt incriminated himself by making various references to selling cocaine, as well as stating that he had three kilograms on hand. When Negrete attempted to buy cocaine from Betancourt, he responded to Negrete's request and said, "I can't do those right now because I have to—I have to feed a lot of people I have out there just like you. Just as I gave you one ounce right now today right now at this time, I already distributed seven pieces of [cocaine] ."

Furthermore, Betancourt mentioned various people by name to whom he delivered cocaine and volunteered that he had "like about 12 [people] and they're all like you. That's it. I want to help them out. I want to help them out." Negrete and Special Agent Mena understood this last statement to mean that there were 12 individuals in addition to Negrete who sold cocaine for Betancourt. In this same meeting, Betancourt gave Negrete thirty-six grams of cocaine.

4

The Customs agents commenced surveillance of Betancourt's apartment, and arrested him on January 17, 2003. Betancourt consented to a search of his apartment, where agents seized one and a half kilograms of cocaine. The agents also found a significant amount of drug paraphernalia and concluded that Betancourt was selling cocaine in kilogram quantities out of his apartment.

(2) The Texas Lottery

Betancourt won the Texas lottery on December 11, 2002. In the forfeiture phase of trial, the government intended to show that Betancourt's interest in the winning Texas lottery ticket was purchased with proceeds from the sale of cocaine. Guadalupe Rosales, Betancourt's neighbor, would regularly pick the numbers for lottery tickets with the understanding that while Betancourt contributed ten dollars and Rosales only five dollars, the two men would split any winnings from the Texas lottery equally. Every time that Betancourt paid Rosales for his share of the lottery tickets, Betancourt would reach into the black bag he always carried to retrieve the money; this was the same bag into which he was regularly seen placing his drug proceeds.

(3) Sentencing

At sentencing, despite Betancourt's numerous objections to the PSR, the district court found that there was sufficient evidence to conclude by a preponderance of the evidence that he supplied cocaine "conservatively estimated at 102 kilograms." The district court also relied on the probation officer's determination that Betancourt was a leader or organizer of criminal activity which involved at least twelve participants. Betancourt's own admissions aided the probation officer in calculating the total amount of cocaine for which he was responsible.

Betancourt now appeals his sentence and the forfeiture, claiming that the district court erroneously calculated the overall quantity of cocaine attributable to him. He further objects to his

5

classification as an "organizer or leader" of a criminal organization. Finally, he asks this Court to find that the forfeiture of his lottery proceeds was in violation of the Excessive Fines Clause of the Eighth Amendment to the Constitution.

## II. DISCUSSION

A. Criminal Organization or Leadership

Betancourt argues that the district court erred in determining that he was a leader or organizer of an extensive criminal organization; this determination enhanced his sentence by four levels under section § 3B1.1(a) of the U.S. Sentencing Guidelines.

(1)  Standard of Review

This Court reviews the district court's findings of fact with respect to sentencing under the clear error standard. *United States v. Glinsey*, 209 F.3d 386, 396 (5th Cir. 2000).  A finding of fact is not clearly erroneous "[a]s long as it is plausible in light of the record read as a whole." *United States v. Morris*, 46 F.3d 410, 419 (5th Cir. 1995).

(2)  The District Court's Application of U.S. Sentencing Guideline § 3B1.1

Section 3B1.1(a) provides that the district court shall increase the offense level by four levels "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S. SENTENCING GUIDELINES MANUAL § 3B1.1(a).

Betancourt's own tape-recorded admissions, the phone records presented at trial, and the testimony of Esparza and Negrete establish that the criminal activity involved more than five participants.  Esparza sold cocaine he received from Betancourt to Mike Luna, Manuel Obregon, Gregorio Hernandez, Armando "La Liona" Rodriguez, Armando Hernandez, Roberto de Los Santos, Joe Cruz, Jesus "Chewy" Rodriguez, and several others.  Betancourt told Esparza that he,

6

Betancourt, sold cocaine to Noe Hernandez, Mike Luna, FNU Rolando, and others in the El Ranchito, San Benito, and Brownsville areas. Negrete saw Betancourt sell cocaine to Esparza, Leo Fuentes, Noe Hernandez, Mike Luna, Ezequiel Pena, Armando "La Liona" Rodriguez, and Jose Belmontes. The district court did not err in finding that the criminal activity involved five or more participants or was otherwise extensive.

Betancourt argues that the evidence did not show that he was a leader or organizer, but merely a supplier. He relies on *United States v. Sayles*, 296 F.3d 219 (4th Cir. 2002), for its holding that "being a buyer and seller of illegal drugs, even in league with more than five or more other persons, does not establish that a defendant has functioned as an 'organizer, leader, manager or supervisor' of criminal activity." *Id.* at 225. We accept the proposition from *Sayles* that the government must show more than that Betancourt was a buyer and seller of illegal drugs; we hold that it has done so.

Application note four in the commentary to the Guideline section sets forth seven factors which courts shall use to determine whether a defendant took on a leadership or organizational role:

> [1] the exercise of decision making authority, [2] the nature of participation in the commission of the offense, [3] the recruitment of accomplices, [4] the claimed right to a larger share of the fruits of the crime, [5] the degree of participation in planning or organizing the offense, [6] the nature and scope of the illegal activity, and [7] the degree of control and authority exercised over others.

U.S. SENTENCING GUIDELINES MANUAL § 3B1.1, cmt. n.4.

The evidence marshaled against Betancourt, viewed in light of these factors, is sufficient to show that the district court did not clearly err in finding that he was a leader of the drug dealing organization. Regarding decision making authority and control over others, Betancourt directed

7

Negrete to build a press and a storage cage for the cocaine preparation and distribution. Betancourt also moved his operation back and forth between Esparza's shop and Negrete's warehouse or home, without consulting with others. Furthermore, Betancourt had others working on his behalf such as when Esparza acted as a carrier for Betancourt, delivering a quarter of an ounce of cocaine to Noe Hernandez and to Mike Luna "two or three times" for Betancourt. Thus, it appears that Betancourt exercised decision making authority and had control over others.

Regarding the nature of Betancourt's participation in the planning and commission of the offense, the evidence shows that Betancourt was the head of the scheme. Betancourt bought cocaine in Matamoros, cut it in his apartment, then distributed it to several other dealers. Betancourt used his expertise to train Esparza in the workings of the operation. He taught Esparza to manage the cocaine business over the course of three trips Esparza made to Betancourt's apartment. Esparza's "training" included instruction in how to dilute, weigh, and package the cocaine.

As to the nature and scope of the illegal activity, Betancourt was the primary if not sole supplier of cocaine for Hernandez, Esparza, Fuentes, Luna, Pena, Rodriguez, Belmontes, and others. Betancourt was responsible for the distribution of a significant quantity of cocaine. *See* discussion *infra* Part II.B.

The record as a whole supports the finding that Betancourt was an organizer or leader of the enterprise. Therefore, the district court did not clearly err in increasing Betancourt's offense level pursuant to § 3B1.1(a) of the U.S. Sentencing Guidelines due to his leadership role in the extensive criminal enterprise.

B. Amount of Cocaine Distributed

Betancourt argues that the district court erred in its determination for sentencing purposes

8

that Betancourt was responsible for the distribution of between fifty and one hundred and fifty kilograms of cocaine.

(1) Standard of Review

"The district court's calculation of the quantity of drugs involved in an offense is a factual determination." *United States v. Alford*, 142 F.3d 825, 831 (5th Cir. 1998). "'Factual findings regarding sentencing factors are entitled to considerable deference and will be reversed only if they are clearly erroneous.'" *Id.* at 831 (quoting *United States v. Watson*, 966 F.2d 161, 162 (5th Cir. 1992)); *see also United States v. Medina*, 161 F.3d 867, 876 (5th Cir. 1998) ("We review drug quantity determinations, as findings of fact, for clear error."). "'A factual finding is not clearly erroneous as long as it is plausible in light of the record as a whole.'" *Alford*, 142 F.3d at 831 (quoting *United States v. Sanders*, 942 F.2d 894, 897 (5th Cir. 1991)).

(2) The District Court's Application of U.S. Sentencing Guideline § 2D1.1

The district court accepted the PSR's conclusion that 102 kilograms of cocaine were attributable to Betancourt in relation to the charged offenses. This amount was based on an estimation of the cocaine Betancourt supplied to Esparza for the period of time between May 2002 and Betancourt's arrest, multiplied by the number of people to whom Betancourt claimed he supplied cocaine. Betancourt urges that he should be liable only for that quantity of cocaine he supplied to Esparza and only for activity taking place from September 2002 through January 17, 2003.

"[A] district court may consider 'estimates of the quantity of drugs for sentencing purposes.'" *Alford*, 142 F.3d at 832 (quoting *United States v. Sherrod*, 964 F.2d 1501, 1508 (5th Cir. 1992)). In *United States v. Medina*, this Court held that the amount of drugs attributable to a defendant for purposes of sentencing "need not be limited to the actual quantities seized; the district judge can make

9

an estimate." 161 F.3d at 876 (citing U.S. SENTENCING GUIDELINES MANUAL § 2D1.1, cmt. n.12) (stating that "types and quantities of drugs not specified in the count of conviction may be considered in determining the offense level" and that "[w]here there is no drug seizure or the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance"). In *Medina*, this Court inferred the amount of drugs for which the defendant was responsible based on extrapolation from the number of border crossings and the amount of cocaine seized during one such crossing. *Id*. at 877.

In making a factual finding "such as the quantity of drugs attributable to a defendant . . . the district judge may consider any information that has 'sufficient indicia of reliability to support its probable accuracy,' including a probation officer's testimony, a policeman's approximation of unrecovered drugs, and even hearsay." *United States v. Huskey*, 137 F.3d 283, 291 (5th Cir. 1998) (citing U.S. SENTENCING GUIDELINES MANUAL § 6A1.3, cmt.). "Ultimately, the district court need only determine its factual findings at sentencing by a preponderance of the relevant and sufficiently reliable evidence. " *Id*. (quotation omitted).

Such extrapolation methodologies have also been upheld by other Courts of Appeals. In *United States v. Oleson*, 44 F.3d 381, 385 (6th Cir. 1995), the Sixth Circuit upheld the district court's finding of the quantity of marijuana involved in the offense, which was derived by multiplying the amount seized upon arrest by the number of trips made. The Second Circuit in *United States v. Moore*, 54 F.3d 92, 102 (2d Cir. 1995), held that the district court did not err in estimating the amount of drugs in its determination of the base offense level, when it "decided on a calculation" which "was carefully considered, conservative, and based on the evidence presented." *Id*.

We hold that the quantity of cocaine calculated in the PSR and adopted by the district court

10

is a conservative extrapolation from the evidence adduced at trial. The probation officer found that Betancourt supplied cocaine to Esparza daily, except Sunday, which the probation officer estimated would be about twenty four days per month.[2] Using a "conservative amount of 1.5 ounces of cocaine delivered a day to Esparza" by Betancourt, the monthly total would have been thirty-six ounces, or approximately one kilogram. Betancourt continued this activity from May 2002 until January 17, 2003, which would be eight and a half months, equating to approximately eight and a half kilograms of cocaine delivered to Esparza. Multiplying this amount by the twelve to represent the individuals to which Betancourt claimed he sold cocaine equals a total of 102 kilograms of cocaine.[3]

The government sets forth three alternate calculations to support the position that the estimates relied on by the district court were reasonable and conservative. The first calculation relies on the probation officer's determinations, but considers only the time frame of September 2002 through January 17, 2003 (four and a half months), and arrives at four and a half kilograms of cocaine. The government then multiplies this amount by twelve, relying on Betancourt's statement that he supplied twelve people, to arrive at the figure of fifty-four kilograms. This figure reflects Betancourt's own admission of the amount of cocaine he supplied to Esparza, and uses the time frame which Betancourt concedes is fair. For fifty-four kilograms, Betancourt's base offense level

---

[2] Presumably, the probation officer arrived at twenty four days per month by multiplying six days a week by four weeks. More accurately, six days per week is 312 times a year (52 x 6), which, divided by twelve months, is exactly twenty six days per month on the average. Had the probation officer based his calculation on twenty six days per month, Betancourt would have been responsible for slightly more cocaine, but the difference is not significant enough to affect his sentencing.

[3] Betancourt actually told Negrete that he sold cocaine to twelve other individuals in addition to Negrete, so the probation officer could have multiplied the amount of cocaine by thirteen instead of twelve.

11

would be thirty-six under U.S. Sentencing Guideline § 2D1.1(c)(2) (more than fifty kilograms of cocaine and less than 150 kilograms), which is the level at which he was sentenced.

In the second alternate calculation, if the district court had extrapolated from Betancourt's statement to Negrete that he bought and sold ten kilograms per week, or the fact that he actually sold one and a half kilograms overnight from January 16 to 17, then Betancourt would be responsible for selling 180 kilograms during the eighteen weeks between September 2002 and January 17, 2003. That amount of cocaine would put Betancourt at the highest offense level specified in U.S. Sentencing Guideline § 2D1.1(c)(1), which is thirty-eight.

In the final alternate calculation, if the district court had extrapolated from Betancourt's admission that he bought (and presumably sold) ten kilograms per week for the entire period from May 2002 until January 17, 2003, he would be responsible for selling 340 kilograms of cocaine during the thirty-four week period, which again would place him at the highest base offense level, thirty-eight.

That the government could have used these alternate calculations to arrive at an equal or greater quantity of cocaine attributable to Betancourt shows that the actual calculation and its result are reasonable.

Betancourt claims that it was inappropriate to multiply by the amount of drugs sold to Esparza. He argues that because the evidence indicated that he had more contact with Esparza than with the others, it was unreasonable to assume that Betancourt sold as much cocaine to the others as he did to Esparza.[4] "'The defendant bears the burden of showing that the information in the PSR

---

[4] Betancourt argues that not only did most of the testimony center on the dealings between Betancourt and Esparza, but phone records presented at trial showed that approximately eighty percent of Betancourt's phone calls were with Esparza and Leo Fuentes, who was always with

relied on by the district court is materially untrue.'" *Alford*, 142 F.3d at 832 (quoting *United States v. Valencia*, 44 F.3d 269, 274 (5th Cir. 1995)). While we acknowledge that the evidence did show that Betancourt had more contact with Esparza than with the others, such evidence is not a sufficient basis for this Court to reverse the determination below in light of the "wide latitude" we give the district court in our review for clear error. *United States v. Cothran*, 302 F.3d 279, 287 (5th Cir. 2002) (citing *Alford*, 142 F.3d at 831). The district court did not err in relying on Betancourt's own statement to Negrete that he supplied twelve other dealers in addition to Negrete to calculate the total amount of cocaine for which Betancourt was responsible. Knowing only the amount of cocaine sold to Esparza, the district court properly used this figure as a multiplier for each dealer to whom Betancourt claimed he sold cocaine. We uphold the district court's determination.

The district court did not clearly err in adopting the PSR's findings, and we conclude that its approach reasonably supported the quantity of cocaine for which Betancourt was held responsible.

C. *United States v. Booker* Claim

Betancourt argues that his Sixth Amendment rights were violated under *United States v. Booker*, 125 S. Ct. 738 (2005), because the district court applied sentencing enhancements under a mandatory sentencing regime based upon facts not admitted by the defendant or found by the jury. Because Betancourt did not raise the claim in the district court that the mandatory application of the Guidelines violated his constitutional rights, this Court reviews for plain error. *United States v. Mares*, 402 F.3d 511, 520 (5th Cir. 2005), *petition for cert. filed* (Mar. 31, 2005) (No. 04-9517). This Court finds plain error when: (1) there was an error; (2) the error was clear and obvious; and

_____

Esparza.

13

(3) the error affected the defendant's substantial rights. *Id.* "If all three conditions are met an appellate court may then exercise its discretion to notice a forfeited error but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (quoting *United States v. Cotton*, 535 U.S. 625, 631 (2002)).

Betancourt's claim meets the first two prongs of the plain error test because the district court committed a Sixth Amendment *Booker* error and because that error is now clear and obvious after *Booker*. *See id.* at 520–21. Betancourt has not, however, met the third requirement that the error affected his substantial rights. He has failed to show, with a probability sufficient to undermine confidence in the outcome, that if the judge had sentenced him under an advisory sentencing regime rather than a mandatory one, he would have received a lesser sentence. *See id.* (quoting *United States v. Dominguez Benitez*, 124 S. Ct. 2333, 2340 (2004)). While the district court imposed a sentence corresponding to the minimum of the properly determined Guidelines range, there is no indication in the record from the judge's remarks or otherwise that the judge would have imposed a lesser sentence under an advisory regime. *Id.* at 521–22.

At sentencing, the district court told Betancourt that he had been "thumbing his nose at the law" and stated that his actions "should disturb most people with a frame of mind of respect for the law and respect for your fellow human being, but most especially respect and love for children." The district court's comments at Betancourt's sentencing strongly suggest that the court would not have imposed a lesser sentence under more flexible guidelines. Betancourt has thus failed to show plain error under *Booker* and *Mares*, and his sentence is affirmed.

D.  The Excessive Fines Clause of the Eighth Amendment

Betancourt argues that the district court violated his Eighth Amendment right against

excessive fines when it entered an order of forfeiture as to his interest in approximately $5.4 million in Texas lottery proceeds. He asserts that pursuant to 21 U.S.C. § 853(a), his maximum forfeiture should be $152,000—twice the $76,000 in gross proceeds found by the jury. This argument confuses forfeitures with fines, misinterprets § 853(a), and has no merit.

21 U.S.C. § 853(a), which governs criminal forfeitures, provides, in part, as follows:

Any person convicted of a violation of this title or title III punishable by imprisonment for more than one year shall forfeit to the United States, irrespective of any provision of State law—

(1) any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of such violation;

(2) any of the person's property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation;

. . .

The court, in imposing sentence on such person, shall order, in addition to any other sentence imposed pursuant to this title or title III, that the person forfeit to the United States all property described in this subsection. In lieu of a fine otherwise authorized by this part [21 U.S.C. §§ 841 et seq.], a defendant who derives profits or other proceeds from an offense may be fined not more than twice the gross profits or other proceeds.

21 U.S.C. § 853(a). This statute sets out what property is subject to forfeiture and distinguishes forfeitures from fines.

All proceeds obtained from unlawful conduct and property traceable to those proceeds are subject to criminal forfeiture. In *United States v. Martinez*, 228 F.3d 587, 590 (5th Cir. 2000), this Court held that an apartment complex built with proceeds from racketeering violations was subject to forfeiture pursuant to 18 U.S.C. § 1963(a)(3), the statute setting out penalties for RICO violations. Section 1963(a)(3) includes the same language—"any property constituting, or derived from, any

15

proceeds which the person obtained, directly or indirectly, from racketeering activity"—as is found in § 853(a). Analysis more directly on point is found in the Seventh Circuit's opinion in *United States v. Vera*: "Section 853(a) is open-ended; *all* property representing the proceeds of drug offenses is forfeitable." 278 F.3d 672, 673 (7th Cir. 2002).

Section 853(a) also sets out a limit for alternate *fines* in drug cases: up to twice the gross profits a defendant derives from the offense. The imposition of a fine is in addition to, not in lieu of, the mandatory forfeiture proved for in § 853(a)(1)–(3). Betancourt's argument that forfeiture of any funds over $152,000 violates the excessive fines provision of the Eighth Amendment confuses forfeiture of property with the imposition of a fine. This Court has held that the Eighth Amendment has no application to forfeiture of property acquired with drug proceeds. *United States v. Buchanan*, 70 F.3d 818, 830 n.12 (5th Cir. 1995) ("[T]he forfeiture of drug proceeds does not constitute punishment, and thus neither the Eighth Amendment prohibition against excessive fines nor double jeopardy analysis is applicable.").[5]

Other Courts of Appeals have similarly held that in such instances the Eighth Amendment does not apply. *See, e.g., United States v. Alexander*, 32 F.3d 1231, 1236 (8th Cir. 1994) ("Forfeiture of proceeds cannot be considered punishment, and thus, subject to the excessive fines clause, as it simply parts the owner from the fruits of the criminal activity."); *United States v. Real Prop. Located at 22 Santa Barbara Drive*, 264 F.3d 860, 875 (9th Cir. 2001) (holding that "the

---

[5] In *United States v. Bajakajian*, 524 U.S. 321 (1998), the Supreme Court held a criminal forfeiture invalid as contrary to the Excessive Fines Clause of the Eighth Amendment. The Court explained that "[i]f the amount of the forfeiture is grossly disproportional to the gravity of the defendant's offense, it is unconstitutional." *Id*. at 337. *Bajakajian*, however, did not involve drugs, contraband, or proceeds thereof.

excessive fines clause of the Eighth Amendment does not apply to a forfeiture action brought under 21 U.S.C. § 881(a)(6),"which governs forfeiture of funds connected with drug trafficking); *United States v. Lot 41, Berryhill Farm Estates*, 128 F.3d 1386, 1395–96 (10th Cir. 1997) (holding that forfeiture of drug proceeds pursuant to § 881(a)(6) "can never be constitutionally excessive").

That Betancourt used his drug proceeds to generate a very large return by winning the Texas lottery is of no import in the forfeiture analysis. *See, e.g., United States v. Hill*, 46 Fed. Appx. 838, 839 (6th Cir. 2002) (where the defendant purchased 616 shares of stock with proceeds from money laundering, and the stock had split and become 9,240 shares, the district court properly ordered the forfeiture of the additional shares because they represented the appreciated value of the properly forfeited 616 shares). Therefore, Betancourt is entitled to no relief on his argument that the Eighth Amendment bars the district court's order of forfeiture.

E. Origin of Funds for Texas Lottery Ticket

The superseding indictment, returned February 26, 2003, gave Betancourt notice that the United States intended to forfeit his interest in the Texas lottery winnings and the combined proceeds he obtained during the course of the conspiracy. After he was convicted, Betancourt elected to have the jury that determined his guilt also determine whether the government established the requisite nexus between the property sought to be forfeited and the offenses he committed, pursuant to FED. R. CRIM. P. 32.2(b)(4). The district court submitted the following question to the jury regarding whether the lottery proceeds were subject to forfeiture:

> Do you find by a preponderance of the evidence that the December 11, 2002, winning Texas lottery ticket was acquired by the defendant with proceeds the defendant obtained, directly or indirectly, during the course of the conspiracy of which you have found him guilty, and there was no likely source for such property other than the conspiracy?

17

The jury answered in the affirmative, thus finding that the ticket was purchased with proceeds from Betancourt's drug trafficking.[6]

Betancourt asserts that the jury's finding that his interest in the winning Texas lottery ticket was purchased with drug proceeds was not supported by the evidence. He argues that the evidence shows that ticket was purchased by his neighbor, Guadalupe Rosales, with Rosales's legitimate money, and not by Betancourt. Betancourt is correct insofar as the evidence does show that it was Rosales who actually purchased the winning ticket. The evidence also shows, however, that Betancourt paid Rosales for a one-half interest in any proceeds from the tickets.[7] Betancourt had an interest in the winning ticket, regardless of who purchased it.

"[A]ny property . . . derived from any proceeds" of drug trafficking is subject to forfeiture. 21 U.S.C. § 853(a). The issue, therefore, is whether the money Betancourt used to acquire this interest in the winning ticket was proceeds from the sale of cocaine. The jury determined that Betancourt derived his entire income from selling cocaine, and this determination is supported by the record.

Betancourt was observed profiting from drug sales in the immediate days preceding the

---

[6] Betancourt did not object to (or argue on appeal about) the wording of the forfeiture instruction. The wording seems questionable, however, as it asks whether the funds were obtained "during the course of" the conspiracy, not whether they were funds received from his sale of drugs. In addition, the instruction asks whether there were "likely" other sources, not whether in fact other sources were used. This is a poor instruction we do not countenance as a model.

[7] Betancourt relies on the district court's finding in its final order of forfeiture that the tickets were purchased by Rosales. This order, however, was regarding Rosales's subsequent third-party petition for a one-half interest in the lottery proceeds. It has no bearing on the source of the funds with which Betancourt acquired his interest in the ticket.

18

lottery, which accounts for the likely source of his funds to purchase the lottery ticket. In the forfeiture phase of trial, the government offered extensive evidence, including Betancourt's failure to file tax returns, to rebut the assertion that Betancourt derived income from any other business venture aside from drug dealing, namely, the sale of used clothing. Neither the State of Texas nor any of the flea markets where Betancourt supposedly sold used clothing had any record of Betancourt's involvement in a legitimate business. Because there is no evidence that Betancourt had any legitimate income with which he could have acquired his interest in the lottery ticket, it follows as a matter of logic that the money used to acquire the interest came from drug sales.

Because the evidence supports the jury's finding that Betancourt purchased his interest in the lottery ticket with funds derived from drug trafficking, the order of forfeiture was proper and is upheld by this Court.

## III. CONCLUSION

Because this Court finds no error in the sentence or order of forfeiture, the judgment of the district court is AFFIRMED.