# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

May 10, 2013

Lyle W. Cayce
Clerk

No. 12-10599

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

HEATHER NICOLE JONES,

Defendant-Appellant

Appeal from the United States District Court
for the Northern District of Texas
No. 4:11-CR-196-8

Before KING, DAVIS, and ELROD, Circuit Judges.

PER CURIAM:[*]

Heather Nicole Jones pled guilty to one count of making, uttering, or possessing a forged and counterfeit security of a private entity, and aiding and abetting the same, in violation of 18 U.S.C. §§ 513(a) and 2. Jones now challenges her sentence, arguing that the district court erred in applying enhancements for: (1) the involvement in the offense of 250 or more victims; (2) an amount of loss in excess of $30,000; (3) the use of "sophisticated means"; and (4) the unauthorized use of a means of identification unlawfully to produce

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

another means of identification. For the reasons set forth below, we conclude that the district court erred in enhancing Jones's sentence based on the involvement in the offense of 250 or more victims, though we affirm the district court's judgment in all other respects. Accordingly, we AFFIRM in part, REVERSE in part, and REMAND for resentencing.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On December 14, 2011, a grand jury indicted Heather Nicole Jones on one count of making, uttering, or possessing a forged and counterfeit security of a private entity, and aiding and abetting the same, in violation of 18 U.S.C. §§ 513(a) and 2. Jones pled guilty to the offense on January 6, 2012, and the district court subsequently sentenced her to a within-Guidelines term of fifty months' imprisonment, to be followed by three years of supervised release. Jones appeals, raising several procedural challenges to her sentence.

Jones stipulated that on or about June 3, 2011, "[she], aided and abetted by others known and unknown, did make, possess, and utter a forged and counterfeit security in the amount of $2,000 purporting to be a security of Southside Bank, . . . and did so with the intent to deceive Southside Bank." Six days later, Jones was driven to the bank by Jereamine Deshawn Moore and Crystal Moore (collectively, "the Moores"). Upon their arrival, Crystal Moore gave Jones a fake identification card bearing Jones's photograph, but the name and other personal information of a different individual. Jones entered the bank, presented the fake identification card to a teller, and, posing as the person identified on the card, "told the teller that she had run out of checks, but needed to write a check on her account." At Jones's request, the teller produced a $2,000 check drawn on the account of the person falsely identified on the card. Jones then marked the check payable to "cash," forged the victim's signature on the check, and returned it to the teller for payment. Suspecting fraud, the teller refused to cash the check, at which point Jones exited the bank.

No. 12-10599

Jones's presentence report ("PSR") reflects that after she left the bank, she reentered the Moores's vehicle and the three fled the scene. Shortly thereafter, police officers stopped the vehicle based on information provided by the teller. After receiving consent to search the vehicle, officers discovered fourteen credit cards in Crystal Moore's name and three fraudulently obtained debit cards containing the names of other individuals. Officers verified that Jones was the individual who attempted to cash the check and arrested her.

Investigators later connected Jones's activities to a larger scheme. As part of that scheme, an unindicted co-conspirator stole mail from at least six blue collection boxes belonging to the United States Postal Service ("USPS"). Using bank account information and other personal data contained in the stolen mail, or information illegally purchased by the Moores from a check-cashing business, co-conspirator Darin Eugene Foley created fraudulent identification cards. "Runners" then were recruited to cash fraudulent checks or withdraw funds directly from the victims' accounts. The Moores oversaw the runners' activities and maintained possession of the fraudulent identification information and checks. As explained in Jones's PSR, although each runner worked with the Moores, "they each acted independently from the other, as their agreement for the jointly undertaken criminal activity was only entered into with [the Moores]."

As to Jones's conduct, the PSR identified her as a runner and stated that "Jones is known to have negotiated between 10 and 20 fraudulent checks during the conspiracy." The report also indicated, however, that "to date, none of the negotiated checks have been associated with her, with the exception of the check she attempted to cash on the date of her arrest." Accordingly, the PSR noted that "no loss amount has been determined as to [Jones]." Similarly, a chart in the PSR summarizing the intended and actual losses caused by each conspirator reflected that Jones was responsible for an intended loss of $2,000, and an actual

3

loss of $0. However, based on evidence that Jones negotiated "between 10 and 20 checks," the probation officer concluded that "a reasonable estimate of [Jones's] loss would be the 15 checks she cashed, at an estimated rate of $2,000 each, combined with the $2,000 check she attempted to negotiate, resulting in an estimated loss of $32,000."

The PSR assessed a Guidelines base offense level of six. *See* U.S.S.G. § 2B1.1(a)(2). Four enhancements then were assigned, resulting in a sixteen-level increase. First, a six-level increase was applied pursuant to § 2B1.1(b)(2)(C), based on a finding that the offense involved 250 or more victims. This enhancement rested on the probation officer's finding that mail was stolen from at least six USPS collection boxes, and Guidelines commentary that each such offense "shall be considered to have involved at least 50 victims." *Id.* § 2B1.1 cmt. n.4(C)(i)(II), (ii)(I). The PSR applied another six-level increase based on the estimated intended loss of $32,000. *Id.* § 2B1.1(b)(1)(D). Next, because the fraudulent scheme involved the use of "sophisticated means," the PSR assigned a two-level increase pursuant to U.S.S.G. § 2B1.1(b)(10)(C). Finally, another two-level increase was applied because the offense involved "the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification." *Id.* § 2B1.1(b)(11)(C)(i). After a three-level reduction for acceptance of responsibility, Jones's total offense level was nineteen. With a category IV criminal history score, Jones's offense level resulted in a Guidelines range of 46–57 months. *Id.* ch. 5, pt. A (sentencing table).

Jones filed objections to the PSR contesting the applicability of each enhancement. In connection with the enhancement based on the number of victims, Jones maintained that she had no involvement in stealing mail from USPS collection boxes, and therefore could not be held responsible for such conduct, or for a presumed number of victims affected by such conduct. As to the

No. 12-10599

amount-of-loss enhancement, Jones contended that the information in the PSR was internally inconsistent, speculative, and not based on reliable facts. Jones further asserted that her mere "act of going into a bank and attempting to cash a check" did not satisfy the standard for imposition of the sophisticated means enhancement. Finally, Jones argued that she was not responsible for creating fraudulent identification cards or checks, so the identity theft enhancement was inapplicable to her.

In response to Jones's objections, the probation officer filed a PSR addendum. Regarding Jones's objection to the number of victims involved in the offense, the addendum simply stated that the related enhancement was applied because Jones "agreed to jointly undertake the activity of cashing between 10 and 21 fraudulent checks, and the offense involved using [identification] cards containing . . . information conspirators stole from at least six different collection boxes." As to Jones's disagreement with the amount-of-loss enhancement, the addendum explained that the information about the number of checks Jones negotiated had been provided by Jereamine Moore, and had been deemed credible. Because Jones was responsible for successfully negotiating "between 10 and 20 checks," the probation office determined that 15 was a "reasonable estimate" of the number of checks Jones cashed, and that the average amount of each check reasonably could be estimated "by using the amount of the check which [Jones] was known to have attempted to negotiate."[1] In connection with the remaining two objections, the addendum explained that Jones's "conduct in the offense exceeded just entering the bank and negotiating or attempting to negotiate fraudulent checks." To the contrary, the addendum noted that Jones "provided a picture to conspirators, which was imposed on a false [identification] card that contained" a different individual's personal information. Had Jones

---

[1] However, as further discussed *infra*, the addendum elsewhere stated that Jones "negotiated the fraudulent checks . . . on at least 11 occasions, if not more."

not provided her picture, the probation officer stated, the fraudulent "card could not have been produced."

Jones filed a response to the addendum in which she noted her continuing objections to the PSR.  The district court overruled each of Jones's objections, and adopted the findings and conclusions in the PSR.  The court then sentenced Jones to a within-Guidelines range of fifty months of imprisonment, to be followed by three years of supervised release.  Jones timely appeals.

## II.  STANDARD OF REVIEW

"We review a district court's interpretation or application of the Sentencing Guidelines *de novo*, but review its factual findings for clear error." *United States v. Alexander*, 602 F.3d 639, 641 (5th Cir. 2010).  "[A] finding will be deemed clearly erroneous if, based on the record as a whole, we are 'left with the definite and firm conviction that a mistake has been committed.'" *United States v. Ekanem*, 555 F.3d 172, 175 (5th Cir. 2009) (quoting *United States v. Castillo*, 430 F.3d 230, 238 (5th Cir. 2005)).  "A district court cannot impose a sentence enhancement . . . unless the government has proven any facts necessary to support the enhancement by a preponderance of the evidence." *United States v. Rodriguez*, 630 F.3d 377, 380 (5th Cir. 2011) (per curiam).

## III.  ANALYSIS

### A.  Number of Victims

Under § 2B1.1(b)(2)(C), a defendant's base offense level increases by six levels where the offense involves 250 or more victims.  In cases in which undelivered mail is stolen from a USPS collection box, each theft "shall be considered to have involved at least 50 victims."  U.S.S.G. § 2B1.1 cmt. n.4(C)(i)(II), (ii)(I).  Here, the district court imposed § 2B1.1(b)(2)(C)'s six-level enhancement based on its conclusion that mail had been stolen from at least six collection boxes, thereby presumptively involving in the offense at least 300 victims.

Jones argues that this was erroneous. She contends that "[t]here were no facts shown, or alleged, that [she] participated in or had knowledge of theft from the mail." Jones further maintains that "there was no determination of the scope of the criminal activity that [she] agreed to jointly undertake," nor was there any "basis to support a finding that the conduct of others in stealing mail was in furtherance of the scope of criminal activity jointly undertaken by [her], or was known [to her], or was reasonably foreseeable [to her]." As we will explain, we agree with Jones's contention that the district court erred in applying this enhancement.

**(1)    Relevant Conduct**

"In fashioning a sentence, a court may consider, as 'relevant conduct,' acts in addition to those underlying the offense of conviction." *United States v. Dickson*, 632 F.3d 186, 192 (5th Cir. 2011). "[I]n the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy)," a defendant's relevant conduct includes "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(B); *see also United States v. Hammond*, 201 F.3d 346, 351 (5th Cir. 1999). "[T]he scope of the criminal activity jointly undertaken by the defendant . . . is not necessarily the same as the scope of the entire conspiracy, and hence relevant conduct is not necessarily the same for every participant." U.S.S.G. § 1B1.3 cmt. n.2.

A sentencing court therefore "must first determine the scope of the criminal activity the particular defendant agreed to jointly undertake." *Id.* Then, to hold a defendant accountable for the number of victims affected by third parties, the court must make findings establishing that: (1) the defendant agreed to undertake criminal activities jointly with the third parties, (2) the victims were affected by the third parties within the scope of that agreement, and (3) the

third parties' misconduct was reasonably foreseeable to the defendant. *Cf. Hammond*, 201 F.3d at 351. "These findings need not be expressly made, but the meaning of the court's findings must be clear." *Id.* We review for clear error a court's determination of what constitutes relevant conduct. *United States v. Mann*, 493 F.3d 484, 497 (5th Cir. 2007).

### (2)    Discussion of Relevant Conduct Findings

In recounting Jones's participation in the fraudulent scheme, the PSR detailed only the incident that formed the basis of her conviction. Again, that incident involved Crystal Moore providing Jones a fraudulent identification card, which Jones used in her effort to cash a forged check against the victim's account. Beyond that, the PSR merely explained that Jones was a runner, and that each runner "acted independently from the other, as their agreement for the jointly undertaken criminal activity was only entered into with [the Moores]." Similarly, the PSR addendum stated that "[a]lthough [she] did not jointly undertake any criminal acts with [various co-conspirators] . . ., Jones entered into a jointly undertaken agreement to commit theft and fraud with [the Moores]." There was no indication in the PSR or its addendum, however, that Jones or the Moores personally stole mail from the collection boxes, or that such conduct was known or reasonably foreseeable to Jones.

Nevertheless, in discussing during the sentencing hearing Jones's objections to the PSR's references to mail theft, the district court stated that "the theft of the mail was part of the jointly undertaken criminal activity" in which Jones engaged, and it therefore "constituted relevant conduct." Likewise, when Jones specifically objected to the application of this enhancement, the court concluded that she "agreed to jointly undertake the activity of cashing checks that were obtained through the theft from the mail, and so she's accountable, as relevant—through relevant conduct for the quantity that is presumed to have—of victims that is presumed to have been involved."

No. 12-10599

From these statements, the district court appears to have been suggesting that the mail was stolen in furtherance of the jointly undertaken criminal activity in which Jones agreed to participate. *See United States v. Burton*, 126 F.3d 666, 679 (5th Cir. 1997) (a district court may infer "from the evidence the scope of the criminal activity to which [a defendant] agreed"); U.S.S.G. § 1B1.3 cmt. n.2 ("In determining the scope of the criminal activity that the particular defendant agreed to jointly undertake . . . the court may consider any explicit agreement or implicit agreement fairly inferred from the conduct of the defendant and others."). While such a conclusion appears to be supported by the record, it nonetheless is insufficient on its own to support the further conclusion that the mail theft constituted Jones's relevant conduct. As the Guidelines commentary makes clear, a defendant's relevant conduct only includes the conduct of others that is "in furtherance of the jointly undertaken criminal activity," *and* is "reasonably foreseeable in connection with that criminal activity." U.S.S.G. § 1B1.3 cmt. n.2.

Here, the district court did not state whether Jones knew or reasonably could have foreseen that the check-cashing scheme involved mail theft. Nor, by extension, did it enter findings explaining what evidence would support such a conclusion. As best we can discern, the district court simply inferred that, because Jones participated in a scheme to use fake identification cards to cash fraudulent checks, she reasonably should have foreseen that the personal information contained in those items might be derived from mail stolen from USPS collection boxes.

To be sure, the Guidelines commentary certainly encourages a court analyzing reasonable foreseeability to consider the nature of the offense. *See* U.S.S.G. § 1B1.3 cmt. n.2(b)(1); *see also United States v. Mergerson*, 4 F.3d 337, 350 (5th Cir. 1993) ("Ordinarily, one co-conspirator's use of a firearm will be foreseeable because firearms are 'tools of the trade' in drug conspiracies.").

No. 12-10599

Nevertheless, it simply cannot categorically be said—as the government implies—that all, or even most, fraudulently obtained personal information is acquired by stealing mail from collection boxes. To the contrary, experience has shown that the means by which personal information might be obtained for fraudulent purposes are limited only by the imaginations of those intent on obtaining it. *See, e.g.*, *United States v. Simmons*, 420 F. App'x 414, 419 (5th Cir. 2011) (per curiam) (unpublished) (personal information purchased by businessperson from her clients and the homeless); *United States v. Perkins*, 287 F. App'x 342, 345 (5th Cir. 2008) (per curiam) (unpublished) (personal data stolen from military personnel who checked out vehicles using their military licenses); *United States v. Tisdale*, 264 F. App'x 403, 405 (5th Cir. 2008) (unpublished) (personal information culled from obituaries and credit reports obtained through defendants' employment); *United States v. Phillips*, 477 F.3d 215, 217 (5th Cir. 2007) (personal data stolen via computer hacking). Indeed, even here, we note that the PSR stated that the personal information used in Jones's scheme was, in some instances, purchased illegally by the Moores from a check-cashing business.

Given the vast array of avenues by which the personal information used to perpetrate Jones's scheme might have been acquired, we are unable to rely simply on the nature of Jones's offense to conclude that her co-conspirator's mail theft was reasonably foreseeable to her. Moreover, having independently reviewed the record, we have found no evidence to substantiate the conclusion that Jones knew or reasonably could have foreseen that the scheme in which she was engaged involved stealing mail from USPS collection boxes. Because the government failed to carry its burden of proving by a preponderance of the evidence that such conduct was known or reasonably foreseeable to her, we are left with the definite and firm conviction that, to the extent the district court entered a finding of fact to the contrary, that finding was mistaken. *See*

*Rodriguez*, 630 F.3d at 383. Accordingly, we reverse the district court's application of the enhancement set forth in § 2B1.1(b)(2)(C).[2]

## B. Amount of Loss

Next, Jones argues that the district court erred in applying a six-level enhancement under § 2B1.1(b)(1)(D) based on its finding that the amount of loss exceeded $30,000. Although the PSR's chart summarizing loss amounts indicated that Jones was responsible for an intended loss of $2,000 and an actual loss of $0, other evidence indicated that Jones was responsible for successfully negotiating "between 10 and 20 checks." The report thus used a midpoint and deemed Jones accountable for successfully cashing 15 checks of $2,000 each, plus the $2,000 check she tried to cash on the day of her arrest. Based on this information, the district court concluded that $32,000 was a reasonable estimate of the loss amount.

Jones contends, however, that the PSR and the PSR addendum were inconsistent as to the number of checks she negotiated. She correctly notes that these reports stated that she "negotiated between 10 and 20 fraudulent checks during the conspiracy"; that she negotiated fraudulent checks "on at least 11 occasions, if not more"; and that "a reasonable estimate of her loss would be the 15 checks that she cashed . . . combined with the [one] check she attempted to negotiate." Jones submits that, given "this confusing array of numbers, it was error for the district court to adopt the PSR findings and conclusions and enhance 6 levels with no factual support for anything other than $2,000 in intended losses."

---

[2] As noted, the court's application of the enhancement contained in § 2B1.1(b)(2)(C) was based on the definition of "victim" associated with mail theft. *See* U.S.S.G. § 2B1.1 cmt. n.4(C)(i)(II), (ii)(I). There is otherwise no evidence in the record that would support the court's application of this enhancement.

**(1)    Applicable Law**

Under the Guidelines, "loss is the greater of actual loss or intended loss." U.S.S.G. § 2B1.1 cmt. n.3(A).  In determining loss amount, "[t]he court need only make a reasonable estimate of the loss.  The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence.  For this reason, the court's loss determination is entitled to appropriate deference." *Id.* § 2B1.1 cmt. n.3(C).  We therefore review the sentencing court's calculation of the loss amount for clear error.  *United States v. Dowl*, 619 F.3d 494, 502 (5th Cir. 2010) (per curiam).  Nevertheless, because the court's method of determining the amount of loss implicates application of the Guidelines, the approach it adopts is reviewed de novo.  *United States v. Klein*, 543 F.3d 206, 214 (5th Cir. 2008).

When a sentencing court uses information in the PSR to make a factual determination such as loss amount, that information generally "is presumed reliable and may be adopted . . . without further inquiry if the defendant fails to demonstrate by competent rebuttal evidence that the information is materially untrue, inaccurate or unreliable." *United States v. Washington*, 480 F.3d 309, 320 (5th Cir. 2007) (internal quotation marks and citation omitted).  For this general rule to apply, however, the PSR's information must "bear[] some indicia of reliability." *United States v. Scher*, 601 F.3d 408, 413 (5th Cir. 2010).  In other words, the PSR cannot simply include bald assertions in an attempt to "convert[] "such statements into reliable evidence, without providing any information for the basis of the statements." *United States v. Taylor*, 277 F.3d 721, 724, 726–27 (5th Cir. 2001) (internal quotation marks and citation omitted).  Rather, the PSR's information must have an "adequate evidentiary basis." *United States v. Caldwell*, 448 F.3d 287, 290 (5th Cir. 2006); *United States v. Alford*, 142 F.3d 825, 832 (5th Cir. 1998).  When it does, a defendant's mere objections to the PSR

No. 12-10599

"do not suffice as competent rebuttal evidence." *United States v. Parker*, 133 F.3d 322, 329 (5th Cir.), *cert. denied*, 523 U.S. 1142 (1998).

**(2)    Discussion**

In essence, Jones challenges both the method of loss calculation, as well as the estimated loss amount. As pertaining to the calculation method, Jones's claim of error is without merit. The Guidelines provide several different factors sentencing courts may consider when estimating loss. U.S.S.G. § 2B1.1 cmt. n.3(C). Included among these is "the scope and duration of the offense and revenues generated by similar operations." *Id.* § 2B1.1 cmt. n.3(C)(vi). Here, the method used to calculate the loss for which Jones was held responsible merely entailed extrapolating the $2,000 loss she intended to inflict on the date of her arrest by an estimate of similar operations in which she was found to have engaged. *See id.* Although Jones challenges the factual determinations underlying that approach, the methodology itself—that of extrapolating a known quantity to unknown quantities—previously has been upheld by this court. *See Unites States v. Betancourt*, 422 F.3d 240, 246–47 (5th Cir. 2005); *United States v. Jones*, 372 F. App'x 530, 531–32 (5th Cir. 2010) (unpublished).

Regarding Jones's challenge to the calculated loss amount, we note at the outset that the PSR addendum identified co-conspirator Jereamine Moore as the source of the PSR's information that Jones negotiated "between 10 and 20 checks." The addendum stated that Moore's information had "been deemed credible," and that, based on that "reliable information," a "reasonable estimate of 15 [checks] (which is in the middle) was used to determine loss." The addendum continued that "[a] reasonable estimate for loss was determined by using the amount of the check [that Jones] was known to have attempted to negotiate, coupled with the average number of checks she was known to have cashed." Based on this information, the district court overruled Jones's objection to the loss estimate.

13

No. 12-10599

Inasmuch as the PSR addendum explained that Jereamine Moore was the source of the "credible" and "reliable" information regarding the number of checks Jones negotiated, the addendum indicates that the information underlying the PSR's loss estimate bore some indicia of reliability. *See Scher*, 601 F.3d at 413. Jones has presented no competent rebuttal evidence demonstrating that the probation officer's reliance on Jereamine Moore's information was misplaced. *See Washington*, 480 F.3d at 320. Rather, Jones has argued that: (1) the PSR and its addendum were unreliable because they purportedly contained inconsistent information as to the number of checks she negotiated, and (2) it was improper for the court to conclude that she successfully negotiated 15 checks.

As to the first of these arguments, our view is that Jones is attempting to manufacture inconsistencies where they simply do not exist. To be sure, the PSR and its addendum do state that Jones "negotiated between 10 and 20 fraudulent checks during the conspiracy"; that she negotiated fraudulent checks "on at least 11 occasions, if not more"; and that "a reasonable estimate of her loss would be the 15 checks that she cashed . . . combined with the [one] check she attempted to negotiate." Plucking these statements from their context, Jones characterizes them as contradictory. Within the context of the case, however, they not only are internally consistent, but they also support the district court's estimated loss amount.

In particular, the probation officer's reports indicate that Jones successfully negotiated "between 10 and 20 checks," and she unsuccessfully attempted to negotiate another check. Thus, the minimum number of fraudulent checks associated with Jones was 11. Given the range provided by Jereamine Moore of "10 to 20 checks," however, it was reasonable to estimate that Jones successfully cashed 15 checks. Coupled with the single check she unsuccessfully attempted to negotiate, the total number of checks underlying her loss amount

14

was estimated to be 16. These various figures, in other words, simply detail different aspects of the PSR's estimated loss calculation. In the absence of other competent rebuttal evidence that the information in the PSR was untrue, inaccurate, or unreliable, we cannot conclude that the district court erred in adopting its findings and conclusions. *See Washington*, 480 F.3d at 320.

Regarding Jones's argument that it was improper for the court to base the loss amount on the conclusion that she had successfully negotiated 15 checks, we reemphasize that "the amount of loss need not be determined with precision." *United States v. Izydore*, 167 F.3d 213, 222 (5th Cir. 1999). To the contrary, "a district court need only make a reasonable estimate of loss." *United States v. Murray*, 648 F.3d 251, 255 (5th Cir. 2011), *cert. denied* 132 S. Ct. 1065 (2012). We therefore reject the notion that the court's estimate was unreasonable or clearly erroneous, especially given the difficulties associated with calculating the loss amount in fraud cases such as this one.

Simply put, the district court's loss calculation method constituted a proper application of the Guidelines. *See Betancourt*, 422 F.3d at 246–47; *Jones*, 372 F. App'x at 531–32. Moreover, because Jones failed to present competent rebuttal evidence demonstrating that the PSR's information was inaccurate or unreliable, we cannot say that the district court improperly adopted its factual findings regarding the loss amount. *See Washington*, 480 F.3d at 320. As a result, we hold that the district court did not err in finding that the amount of loss exceeded $30,000 and, consequently, in applying a six-level enhancement to Jones's sentence under § 2B1.1(b)(1)(D).

## C. Sophisticated Means

Jones also contends that the district court erred in imposing a two-level enhancement under § 2B1.1(b)(10)(C), which the court applied based on its conclusion that Jones's offense was carried out using "sophisticated means." She argues that although the overall scheme involved the use of sophisticated means,

her "conduct was not sophisticated but was simple, garden-variety fraudulent conduct." Further, Jones submits that "there was no showing that [she] knew the scope of the full scheme," and the district court did not "make a determination and finding of reasonable foreseeability."

**(1)     Applicable Law**

As relevant, § 2B1.1(b)(10)(C) provides that a two-level enhancement is proper if an "offense otherwise involved sophisticated means." In related commentary, the Guidelines state that "'sophisticated means' means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." U.S.S.G. § 2B1.1 cmt. n.8(B). We review for clear error a district court's factual finding that a defendant used sophisticated means to carry out his or her offense. *United States v. Clements*, 73 F.3d 1330, 1340 (5th Cir. 1996).

**(2)     Discussion**

In applying the sophisticated means enhancement to her sentence, the district court concluded that Jones "did more than just walk into a bank" to cash a check. Rather, the court noted, "[s]he provided her photograph to be imposed on a false [identification] card that contained identifiers of another person." Because she used that false identification card in her attempt to negotiate a fraudulent check, and because the "overall scheme" involved sophisticated means, the court found the sophisticated means enhancement applicable.

The district court's conclusion is supported by ample authority. In *Clements*, for example, we found no clear error in the application of the sophisticated means enhancement where the defendant's tax scheme involved a series of apparently ordinary transactions whereby the defendant converted payments he received into cashier's checks and then deposited them into his wife's bank account. 73 F.3d at 1340. We upheld the sophisticated means enhancement after explaining that the use of multiple checks and a separate

bank account obscured the link between the defendant and the money, and made it more difficult for the Internal Revenue Service to detect the offense. *Id.*

Similarly, in *United States v. Calderon*, 209 F. App'x 418, 419 (5th Cir. 2006) (per curiam) (unpublished), we affirmed the application of the sophisticated means enhancement where the defendant printed fraudulent checks using a computer program available to anyone, sent the checks through the mail to purchase coins, and walked a check into a financial institution to open an account. In affirming, we held that "[e]ven though certain aspects of [the defendant's] scheme were not sophisticated, the offense as a whole involved sophisticated means." *Id.*; *see also United States v. Rubio*, 225 F. App'x 290, 291 (5th Cir. 2007) (per curiam) (unpublished) ("Viewed in its entirety, the scheme involved sophisticated means even if some . . . aspects of [the defendant's] offense were not sophisticated, and the district court did not clearly err.").

Here, as the district court explained, Jones's activity involved more than merely attempting to negotiate a fraudulent check. Jones admitted to participating in a scheme that required the conspirators to create false identification documents in order to cash fraudulent checks. To execute this fraud successfully, Jones provided her photograph to other conspirators so that it could be used to create the necessary fraudulent identification card, and she attempted to negotiate a forged check while posing as the individual identified on that card. Thus, although certain aspects of Jones's offense may not have been especially complex or intricate, some of the means used by her during her participation in the scheme were sophisticated. *See Clements*, 73 F.3d at 1340; *Calderon*, 209 F. App'x at 419. Accordingly, we conclude that the district court's finding that Jones's offense involved the use of sophisticated means was not clearly erroneous.

## D. Unauthorized Use of a Means of Identification

Lastly, Jones challenges the district court's application of a two-level

enhancement under § 2B1.1(b)(11)(C)(i) for "the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification." She again contends that "she had no involvement with any such conduct and that any such means of identification were produced or obtained" by other conspirators. Jones further asserts that there was no evidence to show that she provided the photograph of herself to be used to create the fraudulent identification document. Finally, she maintains that even if she had provided the photograph herself, the enhancement would be inapplicable because "the act would not have been 'unauthorized'" as required by § 2B1.1(b)(11)(C)(i).

We reject each of Jones's arguments. First, contrary to her assertions, she *was* directly involved in the production of the fraudulent identification card. Her photograph was on the fake card she used on the day of her arrest, and even if she was not directly involved in the card's creation, by providing her photograph to other conspirators, at minimum, it was reasonably foreseeable to her that the fake card would be created. Although she now argues that there was no evidence that she provided her own photograph, she did not contest this issue in the district court. Moreover, "in determining whether an enhancement applies, a district court is permitted to draw reasonable inferences from the facts." *Caldwell*, 448 F.3d at 290. Given that Jones was the one who approached the Moores about participating in this scheme, and that her photograph was on the identification card she used the day of her arrest, the court was entitled to infer that Jones was involved in the production of the fraudulent identification card.

As for Jones's contention that this enhancement was inapplicable because the photograph used to create the false identification card was her own, and, by extension, its use therefore was not "unauthorized," our decision in *United States v. Rhymer*, 299 F. App'x 378 (5th Cir. 2008) (per curiam) (unpublished), *cert. denied*, 129 S. Ct. 1638 (2009), is instructive. There, the defendant ("Rhymer") pled guilty to possession of stolen mail, but challenged the district court's

18

application of the two-level enhancement at issue here. *Id.* at 379.  On appeal, we explained that it was undisputed that Rhymer had "used another woman's personal information to obtain a false identification card that bore Rhymer's photograph and a name slightly different from the name of the woman whose information was stolen." *Id.*  It also was undisputed that "Rhymer intended to negotiate a third party's check using that false identification card."  *Id.* Nevertheless, Rhymer asserted that the enhancement was inapplicable because "she obtained the woman's personal information legally, and the Guideline requires that the victim's identifying information be obtained through unlawful means." *Id.*  We rejected Rhymer's argument, however, concluding that because "Rhymer's use of the woman's personal information to obtain an identification card bearing a false name was not authorized, the enhancement applies on its face." *Id.* at 379–80.

Similarly here, Jones and her co-conspirators used an individual's personal information to produce a fraudulent identification card bearing Jones's photograph.  Jones's offense therefore involved the unauthorized use of one means of identification (i.e., the information abstracted from the stolen mail and illegally purchased personal documents), unlawfully to produce another means of identification (i.e., the fraudulent identification card).  Accordingly, the district court did not err in applying a two-level enhancement pursuant to § 2B1.1(b)(11)(C)(i).

## IV.  CONCLUSION

For the reasons stated herein, we REVERSE the district court's application of the enhancement set forth in § 2B1.1(b)(2)(C), but AFFIRM its judgment in all other respects.  The case is REMANDED for resentencing consistent with this opinion.